**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**German MUNOZ–FLORES,**
**Defendant–Appellant.**

No. 86–5236.

United States Court of Appeals, Ninth Circuit.

Argued March 4, 1987.

Submitted Aug. 2, 1987.

Decided Dec. 12, 1988.

Judy Clarke and Verna J. Wefald, Federal Defenders of San Diego, Inc., San Diego, Cal., for defendant-appellant.

Roger W. Haines, Jr., Asst. U.S. Atty., San Diego, Cal., for plaintiff-appellee.

Before WRIGHT, FERGUSON and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

In this appeal of the denial of a motion to set aside a sentence imposing two twenty-five dollar special assessments for immigration law violations, German Munoz–Flores ("Munoz") contends that passage of the Special Assessment on Convicted Persons (18 U.S.C. § 3013 (1984)) did not comply with the requirements of the origination clause of the Constitution.

We find that the constitutionality of the Special Assessment on Convicted Persons is squarely presented in this appeal. An analysis of the legislative history of the statute persuades us that the enactment of the special assessment failed to comply with the constitutionally mandated procedure. We therefore vacate that portion of the court's sentencing order imposing special assessments.

## FACTS AND PROCEEDINGS

After pleading guilty to two counts of aiding and abetting an alien to elude examination and inspection in violation of 18 U.S.C. § 2 and 8 U.S.C. § 1325, Munoz was sentenced to two years unsupervised probation and ordered to pay special assessments of $25 for each count, pursuant to 18 U.S.C. § 3013.

Munoz moved to correct this sentence under Fed.R.Crim.P. 35(a), asserting that the special assessments were invalid because the legislation authorizing these assessments originated in the Senate contrary to article I, § 7 of the Constitution. The magistrate denied the motion, finding the assessment constitutional, and the district court affirmed. Munoz timely appeals.

## ANALYSIS

### I

### JUSTICIABILITY

■ Before turning to the merits of Munoz's constitutional claim, we must consider whether an origination clause challenge to a statute implicates the political question doctrine, rendering the issue inappropriate for judicial determination. The Supreme Court has indicated that an issue is nonjusticiable when one of the following circumstances is present: (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department"; (2) "a lack of judicially discoverable and manageable standards for resolving it"; (3) "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion"; (4) "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government"; (5) "an unusual need for unquestioning adherence to a political decision already made"; or (6) "the potentiality of embarrassment from multifarious pronouncements by various departments on

one question." *INS v. Chadha,* 462 U.S. 919, 941, 103 S.Ct. 2764, 2779, 77 L.Ed.2d 317 (1983) (quoting *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962)).

The instant case presents none of these factors. The text of the origination clause does not commit its interpretation to the political branches. The standards of the clause are clear, and its application requires no policy determinations. The determination of which house a bill originated in and whether it raises revenue are questions the courts are functionally well-equipped to answer. Finally, this case does not implicate prudential considerations of deference to the decisions of another governmental branch. Although mechanisms allowing Congress itself to question the constitutionality of a bill under the origination clause exist [1], the failure of Congress to inquire whether a statute violates the origination clause should not preclude the courts from doing so. Certainly, this court should not interpret Congress' silence on an origination clause issue to preclude judicial examination, when it has refused *to draw such a conclusion from Congress' explicit finding that a bill did not violate the origination clause. See Armstrong v. United States,* 759 F.2d 1378, 1380 (9th Cir.1985) ("Although Congress has an obligation to enact legislation that it deems to be constitutional, its determination that a particular statute is constitutional does not foreclose or relieve this court from conducting its own analysis of that issue"). *But cf. Texas Assoc. of Concerned Taxpayers v. United States,* 772 F.2d 163, 166–67 (5th Cir.1985) (refusing to analyze a statute under the origination clause on the grounds that Congress had itself previously determined that the statute in question did not violate the origination clause), *cert. denied,* 476 U.S. 1151, 106 S.Ct. 2265, 90 L.Ed.2d 710 (1986). Holding the origination clause justiciable also comports with a number of Supreme Court decisions in which the Court adjudicated origination clause challenges to statutes. *See, e.g., Flint v. Stone Tracy Co.,*

---

1. A resolution asserting the House's constitutional prerogatives is the usual method of legislatively asserting origination clause issues. *See*

3 Deschler's Precedents of the United States House of Representatives § 13 (1974).

220 U.S. 107, 142–43, 31 S.Ct. 342, 345–46, 55 L.Ed. 389 (1911).

Therefore, we consider the merits of Munoz's claim.

## II

## THE ORIGINATION CLAUSE

■ The origination clause provides that "All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills." U.S. Const. art. I, § 7. The origination requirement was intended to grant primary power over taxation to the house more closely tied to the popular will. *See* 2 P. Kurland & R. Lerner, *The Founders' Constitution* 376 (1987). Although diminished concern about the Senate's lack of accountability has largely undermined the clause's rationale [2], the requirement of origination in the House persists and in recent years has been the basis of a number of statutory challenges. *See, e.g., Sperry Corp. v. United States,* 12 Cl.Ct. 736 (1987) (rejecting an origination clause challenge to the Iran Claims Act), *reversed on other grounds,* 853 F.2d 904 (Fed.Cir.1988); *Armstrong,* 759 F.2d at 1378 (upholding the Tax Equity and Fiscal Responsibility Act of 1982 against an origination clause challenge).[3] Indeed, one decision struck down a statute on the grounds that it violated article I, § 7. *Hubbard v. Lowe,* 226 F. 135 (S.D.N.Y.1915), *appeal dismissed,* 242 U.S. 654, 37 S.Ct. 12, 61 L.Ed. 547 (1916).

■ Munoz asserts that the adoption of section 3013 violated article I, § 7. The analysis of an origination clause issue is straightforward and tracks the language of the clause. First, we must gauge whether the statute falls within the class of revenue raising bills covered by the clause. If the bill is one that raises revenue within the meaning of art. I, § 7, the court must next determine if the bill originated in the House, as required by the clause. Finally, the court must examine whether the Senate's participation in the legislative process can be construed as an amendment permissible under the clause. With these guidelines in mind, we turn to an examination of the challenged statute.

### A. *Is the Special Assessment a Revenue Bill?* [4]

By its terms, the origination clause applies only to bills that raise revenue. However, the fact that a statute produces governmental income is not dispositive. Supreme Court decisions hold that origination clause constraints do not extend to bills that incidentally create revenue if those bills were enacted for purposes other than

---

**2.** Almost eighty years ago, Charles Beard dismissed the origination clause in the following terms: "It can hardly be said that it constitutes any safeguard against careless and corrupt finance in legislatures; and it must be admitted also that it has slowly been declining in public esteem." C. Beard, *American Government & Politics* 706–07 (1910).

**3.** Other cases construing the origination clause include: *United States v. Norton,* 91 U.S. 566, 23 L.Ed. 454 (1875); *Twin City Bank v. Nebeker,* 167 U.S. 196, 17 S.Ct. 766, 42 L.Ed. 134 (1897); *Millard v. Roberts,* 202 U.S. 429, 26 S.Ct. 674, 50 L.Ed. 1090 (1906); *Flint v. Stone Tracy Co.,* 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389 (1911); *Rainey v. United States,* 232 U.S. 310, 34 S.Ct. 429, 58 L.Ed. 617 (1914); *United States ex rel. Michels v. James,* 26 F.Cas. 577 (S.D.N.Y.1875) (No. 15,464); *United States v. Billings,* 190 F. 359 (S.D.N.Y.1911), *rev'd on other grounds sub. nom., Pierce v. United States,* 232 U.S. 290, 34 S.Ct. 427, 58 L.Ed. 609 (1914); *Bertelsen v. White,* 65 F.2d 719 (1st Cir.1933); *Mulroy v.*

*Block,* 569 F.Supp. 256 (N.D.N.Y.1983), *aff'd,* 736 F.2d 56 (2d Cir.1984), *cert. denied,* 469 U.S. 1159, 105 S.Ct. 907, 83 L.Ed.2d 922 (1985); *Moon v. Freeman,* 379 F.2d 382 (9th Cir.1967) (dicta); *United States v. Ramos,* 624 F.Supp. 970 (S.D.N.Y.1985); *Leary v. United States,* 395 U.S. 6, 21, 89 S.Ct. 1532, 1540, 23 L.Ed.2d 57 (1969); *State v. Block,* 717 F.2d 874 (4th Cir.1983), *cert. denied,* 465 U.S. 1080, 104 S.Ct. 1444, 79 L.Ed.2d 764 (1984); *Swearingen v. United States,* 565 F.Supp. 1019 (D.Colo.1983); *Edwards v. Carter,* 580 F.2d 1055 (D.C.Cir.), *cert. denied,* 436 U.S. 907, 98 S.Ct. 2240, 56 L.Ed.2d 406 (1978). Recently, the controversy surrounding the passage of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) has produced a large number of origination clause cases. These cases have uniformly upheld TEFRA as not violative of the origination clause. *See, e.g., Hudson v. United States,* 766 F.2d 1288 (9th Cir.1985).

**4.** The "bill" under consideration is the statute providing for the collection of special assessments.

revenue raising. *See, e.g., Millard,* 202 U.S. at 436, 26 S.Ct. at 675; *Nebeker,* 167 U.S. at 202, 17 S.Ct. at 768–69; *Norton,* 91 U.S. at 569.

These precedents mandate an inquiry into the purposes of the special assessment legislation to determine if the challenged statute is a "Bill[ ] for raising Revenue" within the meaning of the origination clause. The relevant question is: was the special assessment statute enacted "for the direct and avowed purpose of creating revenue or public funds for the service of the government"? *Norton,* 91 U.S. at 569 (quoting *United States v. Mayo,* 26 F.Cas. 1230 (C.C.D.Mass.1813) (No. 15,755) (interpreting the term "revenue law" in the context of an 1804 federal crimes act)).

To determine the purpose of the special assessment we first turn to the language of the statute. Section 3013 provides:

(a) The court shall assess on any person convicted of an offense against the United States

  (1) in the case of a misdemeanor

    (A) the amount of $25 if the defendant is an individual; and

    (B) the amount of $100 if the defendant is a person other than an individual; and

  (2) in the case of a felony

    (A) the amount of $50 if the defendant is an individual; and

    (B) the amount of $200 if the defendant is a person other than an individual.

(b) Such amount so assessed shall be collected in the manner that fines are collected in criminal cases

(c) The obligation to pay an assessment ceases five years after the date of the judgment.

(d) For the purposes of this section, an offense under section 13 of this title is an offense against the United States.

On its face, the statute offers little insight into its underlying purpose. The subsection requiring that the assessments be collected in the same manner as criminal fines might be read to suggest that the assessment is analogous to a criminal fine, and thus is punitive. However, the wording does not indicate explicitly that the special assessment is meant to punish, and the subsection addressing collection may be interpreted as a purely procedural requirement. Most important, the language fails to limit or even to describe the use of the collected funds. This lack of restriction suggests that the revenue raising aspect of the bill is not subsidiary to any enunciated function.

■ Because the statutory language is ambiguous, we examine legislative history to infer Congress' intent. *See Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). In its report, the Senate Committee on the Judiciary states:

The purpose of imposing nominal assessment fees is to generate needed income to offset the cost of the [victims' assistance fund] authorized under S. 2423. Although substantial amounts will not result, these additional amounts will be helpful in financing the program *and will constitute new income for the Federal government.*

S.Rep. No. 497, 98th Cong., 2d Sess. 13–14 (1984), *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3607, 3619–20 [hereinafter S.Rep. No. 497] (emphasis added).

This statement of purpose and the testimony by the provision's sponsor, Senator Heinz, *see The Victims of Crime Assistance Act of 1984: Hearings on S. 2423 Before the Senate Comm. on the Judiciary,* 98th Cong., 2d Sess. 21 (1984) [hereinafter *Hearings*], demonstrate that the special assessment was in part intended to contribute to a fund to help defray the costs of eligible state criminal victim assistance programs. *See* 42 U.S.C. §§ 10601(b)(2), 10602. Had the proceeds been clearly confined to this purpose, the bill might well have passed constitutional muster. Its purpose might have been held not to be the raising of revenue, despite the fact that the goal of funding state criminal victim assistance programs could have been accomplished only by the raising of revenue. *See, e.g., Millard,* 202 U.S. at 436–37, 26 S.Ct. at 675 (holding that a bill

providing payment to a railway company of money raised by a tax on District property was not a revenue raising bill within the compass of the origination clause); *cf. Sperry,* 12 Cl.Ct. at 742–43 (upholding against an origination clause challenge an act that authorized deductions from awards of the Iran Claims Tribunal because the purpose of the act was to expedite the settlement of claims against Iran and to shift the cost of maintaining the tribunal to those who benefit most from it).

However, as the underlined passage of the statement of purpose indicates, Congress contemplated that the revenue might be used as general federal revenue.[5] In addition, Congress failed to restrict the use of the monies assessed under section 3013 in any way, so that they might be shifted to another purpose at any time. A final indication of the fact that the special assessment's main purpose was not to fund victim assistance programs is the concession by Congress in its statement of purpose that only small amounts would be collected by the assessments.

The government urges that we find the purpose of the special assessment to be the punishment of offenders, rather than the collection of revenue. A number of arguments are offered in support of this position. First, in the legislative history, the assessment is referred to as a "penalty assessment." Second, the special assessment is levied only on convicted persons. Third, several circuits have held the special assessments to be penal in nature. We find these arguments unpersuasive, and address them in turn.

■ First, the term used to refer to the assessment does not determine its purpose. "Penalties" are defined functionally, by their effect, rather than by the word used

to describe them. If the special assessment is intended to raise revenue for government use, rather than to punish offenders, the name by which it is called is irrelevant. *See United States v. La Franca,* 282 U.S. 568, 572, 51 S.Ct. 278, 280, 75 L.Ed. 551 (1931). In addition, although the Senate hearing report, S.Rep. No. 497, *supra,* at 5, 13, 1984 U.S.Code Cong. & Admin.News, at 3611, 3619 and the original bill used the term "penalty assessment," the word "penalty" does not appear in the codified version of the statute. Instead, the term "special assessment" is used. 18 U.S.C. § 3013. This suggests that Congress, by altering the reference, may not have conceived of the assessment, at least in its final form, as a penalty. Finally, as discussed above, the legislative statement of purpose does not mention punishment as a purpose of the special assessment.

■ Second, the fact that the special assessment exacts money only from convicted persons does not necessitate that its purpose be punitive. The special assessment could also be interpreted as an expression of Congress' power to tax under art. I, § 8 of the Constitution. "[T]he Framers did not intend to restrict Congress' ability to define the class of objects to be taxed." *United States v. Ptasynski,* 462 U.S. 74, 82, 103 S.Ct. 2239, 2244, 76 L.Ed.2d 427 (1983). Therefore, a levy on the class of convicted persons may be a tax, rather than a penalty.

Third, although a number of courts have found the special assessment statute to be punitive, all but one decision involved contexts other than the origination clause. *See United States v. Mayberry,* 774 F.2d 1018 (10th Cir.1985) (holding that the special assessment is a form of punishment for purposes of the Assimilative Crimes Act); *United States v. Davis,* 845 F.2d 94, 97 n. 2

---

**5.** The testimony of Lois Herrington, Assistant Attorney General, before the Senate Judiciary Committee also supports this position. When asked about the administration's position on the proposed special assessments, Herrington stated:

> Well, when we first looked into this on the task force, we looked into the size of the source of the funding and whether it would be really worthwhile to go after this, how

much it would cost us to get it. We figured out it would be approximately $2 million as a fund. *There are also several other proposals within the Department of Justice looking into how to use it in the criminal justice area.* Because of the increase in the fine collection in the last year, we did not use this as a source of funding. It is a very small amount in the total fine collection.

*Hearings, supra,* at 36 (emphasis added).

(5th Cir.1988) (same); *United States v. King*, 824 F.2d 313, 317 (4th Cir.1987) (interpreting *Ray v. United States*, 481 U.S. 736, 107 S.Ct. 2093, 95 L.Ed.2d 693 (1987) (to imply that the special assessment was punitive, and therefore constituted punishment for purposes of the Assimilative Crimes Act). *But cf. United States v. Donaldson*, 797 F.2d 125, 127 (3d Cir.1986) (finding that rule of lenity does not govern the interpretation of § 3013, because the statute is not criminal, as the purpose of the section is to raise revenue to support state crime victim compensation programs); *United States v. Dobbins*, 807 F.2d 130 (8th Cir.1986) (same).

These courts, in evaluating the purpose of section 3013 in light of challenges that did not involve the origination clause, unsurprisingly failed to perform the purpose analysis mandated by the origination clause. The importance of that failure can be seen by examining a decision of this court. In *United States v. Smith*, 818 F.2d 687 (9th Cir.1987), the Ninth Circuit held that the Congress intended section 3013 to be "a punitive measure designed to raise some revenue," concluding that "[a] punitive measure designed to raise revenue is still a punitive measure." *Id.* at 690. *Smith* is distinguishable from the present case, however, because the determination that the special assessment was a punishment was relevant only in determining that its imposition on the defendants without resort to a jury trial did not violate their seventh amendment rights. The court did not explore the further constitutional implications of the finding that "Congress undeniably intended section 3013 assessments to produce revenue." *Id.* *Smith* did not determine the "primary purpose" of the special assessment nor did it consider whether it was a tax within the meaning of the origination clause.

We decline to follow the one case that rejected an origination clause challenge to section 3013, holding that section 3013 was punitive for purposes of the origination clause. *See United States v. Ramos*, 624 F.Supp. 970, 973 (S.D.N.Y.1985). *Ramos* conducted a one-paragraph analysis of the origination clause issue and adopted the

holding of *Mayberry* that the measure was punitive, ignoring the fact that *Mayberry* did not involve an origination clause challenge.

We conclude, therefore, that for purposes of the origination clause the primary purpose of the special assessment was to raise revenue, not to finance state victim assistance programs or to punish offenders. Because section 3013 is a bill for raising revenue, the Constitution requires that the special assessment legislation have originated in the House of Representatives. We will now examine the legislative history to determine whether the legislation complied with this prescription.

### B. *In Which House Did Section 3013 Originate?*

■ Although the parliamentary history of section 3013 is somewhat complex, it clearly indicates that section 3013 originated in the Senate. The history of the bill's passage is in general outline as follows. *See generally The Crime Control and Fine Enforcement Acts of 1984: A Synopsis*, Federal Judicial Center (1985) (summarizing the Comprehensive Crime Control Act's legislative history).

On May 1, 1984, in hearings on S. 2423, the Victim of Crime Assistance Act of 1984, before the Senate Committee on the Judiciary, Senator John Heinz proposed a provision allowing for the collection of "penalty assessments" from convicted persons. *See Hearings, supra*, at 21. On May 10, 1984, the Committee on the Judiciary ordered the bill reported, including the newly added section authorizing the collection of special assessments. *See* S.Rep. No. 497, *supra*, at 3, 1984 U.S.Code Cong. & Admin.News, at 3609. The Senate passed S. 2423 on August 10, 1984. *See* 1984 U.S.Code Cong. & Admin.News 3607. This bill was never passed by the House. However, on October 4, 1984, the Senate added the text of the Victims of Crime Assistance Act of 1984, including the special assessment provision, to a joint resolution making continuing appropriations for the fiscal year 1985 (H.J.Res. 648). Thurmond Amendment No. 7043, 98th Cong., 2d

Sess., 130 Cong.Rec. S13,520, S13,544 (daily ed. Oct. 4, 1984). Although H.J.Res. 648 had been approved by the House on September 28, 1984, as passed by the House the joint resolution contained no provision relating to special assessments. *See* Joint Explanatory Statement of the Committee of Conference, 1984 U.S.Code Cong. & Admin.News 3710, 3713–14. The provision establishing the special assessments ultimately became part of the Comprehensive Crime Control Act of 1984, itself forming one of many unrelated titles in H.J.Res. 648 as adopted by the House on October 10, 1984 pursuant to the conference agreement. *See id.* The Senate passed the modified version of H.J.Res. 648 on October 11, 1984, and the bill became law on October 12, 1984 (Pub.L. No. 98–473).

Although section 3013 ultimately passed both houses of Congress as a minor component of the continuing appropriations resolution for 1985, the Senate clearly initiated the special assessment legislation. The special assessment provision was introduced in the Senate Judiciary Committee, it was first passed by the Senate and was only adopted by the House on later repassage of H.J.Res. 648. Based on this reading of the legislative history, we hold that that section 3013 originated in the Senate.

C. *Can the Senate's Passage of Section 3013 be Construed as a Permissible Germane Amendment of a House Revenue Bill?*

Our holdings that section 3013 is a revenue bill and that it originated in the Senate do not require that we find the legislation violative of the origination clause. The Constitution permits the Senate to "propose or concur with Amendments as on other Bills." U.S. Const. art. I, § 7. However, the power of the Senate to amend a bill originating in the House is not unlimited. The Senate's amendment must be germane to the subject matter of the House bill. *See Flint,* 220 U.S. at 143, 31 S.Ct. at 346; *Armstrong,* 759 F.2d at 1381. The Senate has conceded that the Senate's authority to attach revenue-raising amendments to House bills applies only to revenue bills. 2 Hinds' Precedents of the House of Representatives of the United States § 1489 (1907); *see also Armstrong,* 759 F.2d at 1382. ("'[O]nce a revenue bill has been initiated in the House, the Senate is fully empowered to propose amendments").

■ House joint resolution 648 did not deal with the raising of revenue. As the district court correctly noted "the subject matter of the House bill in this case was crime control—not raising revenue. Thus, regardless of the effect of the 'amendment,' the 'amended portion' of the legislation did not address revenue collection...." *United States v. Munoz–Flores,* Crim. No. 85–0509–E (S.D.Cal. Aug. 6, 1986) (memorandum decision) at 7 n. 3. The Senate's amendment relating to revenue raising was not an amendment to a revenue bill within the meaning of the origination clause.

### III.

### CONCLUSION

Statutes should be construed to avoid constitutional questions; however, this tenet of statutory construction is not a license for the judiciary to overlook procedural errors by the legislative branch that violate the Constitution. *Cf. United States v. Albertini,* 472 U.S. 675, 680, 105 S.Ct. 2897, 2902, 86 L.Ed.2d 536 (1985) (judiciary may not rewrite language enacted by the legislature to avoid a constitutional question).

The primary purpose of section 3013 is revenue raising; the legislation originated in the Senate, and the special assessment cannot be interpreted as an amendment of a House revenue bill. We therefore find that the special assessment is violative of article I, § 7. As such, the special assessment is "not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed." *Norton v. Shelby County,* 118 U.S. 425, 442, 6 S.Ct. 1121, 1125, 30 L.Ed. 178 (1886).

Because we hold that the special assessment on convicted persons is unconstitu-

tional, we do not reach other issues raised by Munoz.

SENTENCE VACATED IN PART.