**UNITED STATES of America, Plaintiff,**

**v.**

**Donovan Juan MICHAELS, Defendant.**

**Crim. No. 4–88–112(1).**

United States District Court,
D. Minnesota,
Fourth Division.

Feb. 28, 1989.

Jerome G. Arnold, U.S. Atty. and James E. Lackner, Asst. U.S. Atty., Minneapolis, Minn., for plaintiff.

Daniel M. Scott, Federal Public Defender, Minneapolis, Minn., for defendant.

DOTY, District Judge.

After a jury trial, defendant Donovan Juan Michaels was convicted of six counts of violating 21 U.S.C. § 841(a)(1), distribution of a controlled drug substance; one count of violating 21 U.S.C. § 846, conspiracy to distribute a controlled drug substance; and one count of violating 18 U.S.C. § 924(c), use of a firearm during, and in relation to, a drug trafficking crime. At the time of sentencing, Michaels will be assessed $50 per count as required by 18 U.S.C. § 3013. In anticipation of sentencing, Michaels has moved the Court for an order declaring § 3013 unconstitutional and precluding its application in this case.

On October 12, 1984, the Comprehensive Crime Control Act of 1984, Title II of Pub. L. 98–473, 90 Stat.1976, became law.[1]

---

1. The Comprehensive Crime Control Act, itself, was a component of H.J.Res. 648, which provided for continuing appropriations for the 1985 fiscal year. H.J. Res. 648 was adopted by the House on October 10, 1984 and by the Senate, in a modified version, on October 11, 1984.

Chapter XIV of this Act is known as the Victims of Crime Act of 1984 and § 1405 of this chapter, 90 Stat.1976, 2174 enacts a mandatory penalty assessment upon all convicted federal defendants. The provision, which has been codified as 18 U.S.C. § 3013, provides:

(a) The court shall assess on any person convicted of an offense against the United States—

(1) in the case of a misdemeanor—

(A) the amount of $25 if the defendant is an individual; and

(B) the amount of $100 if the defendant is a person other than an individual; and

(2) in the case of a felony—

(A) the amount of $50 if the defendant is an individual; and

(B) the amount of $200 if the defendant is a person other than an individual.

(b) Such amount so assessed shall be collected in the manner that fines are collected in criminal cases.

(c) The obligation to pay an assessment ceases five years after the date of the judgment.

(d) For the purposes of this section, an offense under section 13 of this title is an offense against the United States.

Citing *United States v. Munoz–Flores*, 863 F.2d 654 (9th Cir.1988), Michaels contends that § 3013 violates the origination clause of the Constitution because § 3013 is a revenue raising bill and the legislation containing that provision originated in the Senate.

The origination clause provides that "All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills." U.S. Const. art. I, § 7. The language of the origination clause suggested to the Ninth Circuit a three-step analysis for the resolution of challenges under it:

First, [the court must determine] whether the statute falls within the class of revenue raising bills covered by the clause. If the bill is one that raises revenue within the meaning of art. I, § 7,

the court must next determine if the bill originated in the House, as required by the clause. Finally, the court must examine whether the Senate's participation in the legislative process can be construed as an amendment permissible under the clause.

*Munoz–Flores*, 863 F.2d at 657.

Although a statute produces income for governmental use, it may not be subject to origination clause constraints. Statutes that were enacted for purposes other than revenue raising, but incidentally create revenue, are not "Bills for raising Revenue". *Millard v. Roberts*, 202 U.S. 429, 436–37, 26 S.Ct. 674, 675–76, 50 L.Ed. 1090 (1906) (No violation of the origination clause because " '[t]here was no purpose by the Act ... to raise revenue to be applied in meeting the expenses or obligations of the Government.' ... Whatever taxes are imposed are but means to the purposes provided by the act."); *Twin City Bank v. Nebeker*, 167 U.S. 196, 202, 17 S.Ct. 766, 769, 42 L.Ed. 134 (1897) (Revenue bills are bills that "levy taxes, in the strict sense of the word, and are not bills for other purposes which may incidentally create revenue".); *United States v. Norton*, 91 U.S. 566, 569, 23 L.Ed. 454 (1875). Thus, the essential issue is whether the special assessment statute was enacted " 'for the direct and avowed purpose of creating revenue or public funds for the service of the government'?" *Munoz–Flores*, 863 F.2d at 658 (quoting *Norton*, 91 U.S. at 569).

With this precedent in mind, the Ninth Circuit in *Munoz–Flores* examined § 3013 following the three-step analysis set forth above. The court first examined the language of § 3013 to determine whether it was enacted for the purpose of generating funds for the service of government. Because the language of § 3013 "offers little insight into its underlying purpose", the court turned to legislative history. 863 F.2d at 658. Focusing on a portion of the legislative history stating that the special assessments "will be helpful in financing the [crime victims assistance] program and will constitute new income for the Federal government", the court concluded that

§ 3013 was established, primarily, to raise general federal revenue.[2] Therefore, to survive an origination clause challenge, the bill must have originated in the House. *Id.* After an examination of the parliamentary history of § 3013, the Ninth Circuit found that it originated in the Senate and was not an amendment of a House bill. Accordingly, the court held that § 3013 violated the origination clause of the Constitution. *Id.* at 660–61.

As in *Munoz–Flores*, this Court concludes that the language of § 3013 sheds little light on its underlying purpose[3] and that, accordingly, an examination of the legislative history is required. Section 3013 was first introduced as Title II of S. 2423, a proposed Victims of Crime Assistance Act of 1984. Much of Title II, Chapter XIV of the Comprehensive Crime Control Act of 1984, including the special assessment provision, was drawn from S. 2423. In a report accompanying S. 2423, the Senate Committee on the Judiciary (hereinafter "Committee") stated that the purpose of the special assessment provision was "to generate needed income to offset the cost of new programs authorized under S. 2423", S.Rep. No. 497, 98th Cong., 2d Sess. 13 (1984), *reprinted in* 1984 U.S.Code Cong. & Admin. News 3182, 3607, 3619, and acknowledged that "[a]lthough substantial amounts will not result, these additional amounts will be helpful in financing the program and will constitute new income for the Federal government." *Id.* at 13–14, U.S.Code Cong. & Admin. News at 3619–20.

The special assessment provision, however, was only a small portion of the proposed Victims of Crime Assistance Act of 1984 and, therefore, its purpose and history should be considered in light of its relationship to the remainder of the legislative package. The overall purpose of the Act was:

(1) To establish a special fund in the United States Treasury to finance payments to State and Federal victims compensation and assistance programs;

(2) To encourage states to provide assistance to victims of crime within their borders regardless of the victim's residence or the jurisdiction of the crime;

(3) To assist local government and private nonprofit organizations in providing direct service to victims of crime and to promote national development of comprehensive victims services;

(4) To create a safe and welcome environment for victims who will be involved in the criminal justice process; and

(5) To improve Federal assistance to victims of Federal crime.

*Id.* at 4–5, U.S.Code Cong. & Admin. News at 3610–11.

Section 3013 was an important component of the legislative plan to aid victims, and was proposed as a means to achieve the stated goals rather than as a means to generating general federal revenue. A significant feature of the proposed Victims of Crime Assistance Act was that it would not materially increase the federal budget deficit; the Crime Victims Assistance Fund (hereinafter "Fund") was not to be created or maintained primarily through the appropriation of federal funds. Instead, the Fund would receive all special assessment fees, all criminal fines imposed in federal cases, any contributions collected from the public for the purpose of aiding victims of crime and all monies paid to a convicted federal defendant under a contract to depict his crime in the media. *Id.* at 5, U.S. Code Cong. & Admin. News at 3611.

---

**2.** Without the addition of the phrase concerning "new income for the Federal government", however, the Ninth Circuit stated that, "the bill might well have passed constitutional muster. Its purpose might have been held not to be the raising of revenue, despite the fact that the goal of funding state criminal victim assistant programs could have been accomplished only by the raising of revenue." *Munoz–Flores*, 863 F.2d at 658 (citing *Millard v. Roberts*, 202 U.S. 429, 436–37, 26 S.Ct. 674, 675–76, 50 L.Ed. 1090 (1906)).

The Eighth Circuit has held that the purpose of § 3013 is to aid victims of crime, *United States v. Dobbins,* 807 F.2d 130 (8th Cir.1986), but has not had an opportunity to determine the applicability of the origination clause restriction.

**3.** Section 3013(b), providing that assessments should be collected in the same manner as criminal fines, tends to suggest that the assessment is not a levy of taxes in the strict sense of that word. *See Twin City Bank v. Nebeker,* 167 U.S. 196, 202, 17 S.Ct. 766, 769, 42 L.Ed. 134 (1897).

Although the Fund was expected to be endowed by sources other than general federal revenue, Congress did not contemplate that these sources would exceed the funding needs of the various victims assistance programs. This fact, combined with the role of § 3013 in the entire legislative scheme, compels the conclusion that Congress did not have any intent to use § 3013 as a means of generating general federal revenue.

It is true that S. 2423 did contain a provision setting a ceiling on the Victims of Crime Assistance Fund of $100,000,000. S.Rep. No. 497 at 5, U.S.Code Cong. & Admin. News at 3611. The Committee, however, did not expect a surplus. In fact, the Committee stated that "deposits into the fund *could conceivably* range *up to* the $100 million ceiling imposed by the bill." *Id.* at 21, U.S.Code Cong. & Admin. News at 3627 (emphasis added). The Committee's further comments suggest that it was contemplated that some additional federal funds might be necessary to adequately endow the Crime Victims Assistance Fund: "While the bill would authorize new spending, the increased fines, improved collections, penalty assessment fees, and public donations *could conceivably* offset *much* of that spending authority." *Id.* (emphasis added).

The legislative history of the Crime Victims Assistance Act, as a whole, makes clear that § 3013 was an integral part of a legislative scheme to aid victims of crime without significantly increasing the federal budget deficit.[4] Because the legislative history suggests, however, that Congress did not expect that the funds raised from fines, special assessment, and donations would exceed the $100,000,000 ceiling on the Fund, the Court cannot conclude that the special assessment provision had a purpose independent of its role in generating income for the Fund. The special assessment provision was merely a means to achieve the goals of the Victims of Crime Assistance Act of 1984. As such, § 3013 cannot be characterized as a "Bill[ ] for raising Revenue" within the meaning of art. I, § 7 of the Constitution and, therefore, need not have originated in the House.[5]

Accordingly, IT IS HEREBY ORDERED that defendant's motion to declare 18 U.S. C. § 3013 unconstitutional and preclude its application in his case is denied.

---

4. Because § 3013 was only one part of a comprehensive plan, the Court is unwilling to place undue emphasis on a single reference in the legislative history to "new income for the Federal government." Further, it would be erroneous to construe this phrase to mean that new sources of income were being created for the government's general use. Earlier in the Senate report, when the Committee discussed the changes it had made in S. 2423, the meaning of the phrase concerning "new income" is explained:

"First, the sources of revenue are increased. Because of concern among Members about spending increases, the reported bill increases fines available for deposit by increasing maximum fines across-the-board and improving fine collection procedures. New sources of revenue in the form of blanket 'penalty assessment fee' and public donations are authorized."

*See* S.Rep. No. 497 at 5, U.S.Code Cong. & Admin. News at 3611.

5. The government has not argued that § 3013 originated in the House. Even if it had, the Court agrees with the Ninth Circuit's analysis and conclusion that § 3013 originated in the Senate and was not an amendment of a House bill.