885 F.2d 36
 58 USLW 2179, 58 USLW 2188
 UNITED STATES of America, Petitioner,
v.
Charles Leroy SIMPSON, Actual Respondent,
The Honorable William L. Standish, Nominal Respondent.
UNITED STATES of America, Petitioner,
v.
Stephanie HAMILTON, Actual Respondent,
The Honorable William L. Standish, Nominal Respondent.
UNITED STATES of America, Appellant,
v.
SIMPSON, Charles Leroy.
The UNITED STATES
v.
Stephanie HAMILTON, Mark A. Lyle United States of America, Appellant
 Nos. 89-3289, 89-3290, 89-3180, 89-3181.
 United States Court of Appeals,
Third Circuit.
 Argued July 20, 1989.
Decided Sept. 5, 1989.
 
 Charles D. Sheehy, Acting U.S. Atty., Constance M. Bowden (argued), Asst. U.S. Atty., Pittsburgh, Pa., for appellant/petitioner.
 George E. Schumacher, Federal Public Defender, David G. Rothey, Asst. Federal Public Defender, Pittsburgh, Pa., for appellee/respondent Hamilton.
 Joel B. Johnston (argued), Asst. Federal Public Defender, Pittsburgh, Pa., for appellee/respondent Simpson.
 Before STAPLETON, SCIRICA, and WEIS, Circuit Judges
 OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 I.
 
 1
 This is an appeal from an order granting defendants' motions under Rule 35(a), Fed.R.Crim.P., to set aside special assessments imposed pursuant to the Victims of Crime Act of 1984, 18 U.S.C. Sec. 3013. Alternatively, the government has petitioned for a writ of mandamus ordering the district court judge to reinstate defendants' special assessments.
 
 
 2
 In November, 1988, defendants-appellees pleaded guilty to thefts from the mails occurring prior to November 1, 1987. They received prison sentences and $50 assessments under 18 U.S.C. Sec. 3013. Defendants later brought a proceeding under Rule 35(a) of the Federal Rules of Criminal Procedure in which they argued that the their sentences had been imposed in violation of the requirement in art. I, Sec. 7 of the Constitution that all revenue raising bills originate in the House of Representatives. In a memorandum opinion, the district court agreed with defendants, relying on our decision in United States v. Donaldson, 797 F.2d 125 (3d Cir.1985) (holding that Sec. 3013 is not a penal statute for purposes of the rule of lenity), and United States v. Munoz-Flores, 863 F.2d 654 (9th Cir.1988) (concluding that Sec. 3013 originated in the Senate). This appeal and petition raise two principal issues: (1) whether a claimed violation of the Origination Clause constitutes a nonjusticiable political question, and (2) whether, if justiciable, the special assessment raises revenue and originated in the House of Representatives within the meaning of the Origination Clause.
 
 II.
 
 3
 Before discussing the merits of the case, we must confront three jurisdictional issues: (1) whether the district court had jurisdiction under Rule 35(a), Fed.R.Crim.P., to decide the constitutionality of the special assessment; (2) whether we have jurisdiction to hear the government's appeal from the district court's decision; and (3) if not, whether this an appropriate case for a writ of mandamus.
 
 
 4
 In regard to the first issue, the government contends that, in light of our recent case law, the district court had no jurisdiction over this matter. The government first notes that this court held in United States v. Donaldson, 797 F.2d at 125, 127, that the Sec. 3013 special assessment is not a criminal statute to which the rule of lenity applies, but a device for funding a government program. Second, the government argues that Rule 35 applies only to criminal statutes. Therefore, concludes the government, because Sec. 3013 is not a criminal statute, Rule 35 provides no remedy for an illegal imposition of a special assessment.
 
 
 5
 We disagree. Rule 35(a), as applied in cases involving offenses committed prior to November 1, 1987, provides that a district court "may correct an illegal sentence at any time." The rule does not elaborate on the meaning of the term "sentence," and in particular does not limit it to penal measures. While we did observe in Donaldson that the assessment statute "neither defines a substantive offense nor establishes the sentence to be imposed for a criminal offense," 797 F.2d at 123, we do not believe that observation is particularly helpful in interpreting the word "sentence" in the context of Rule 35(a). In the context of a provision authorizing post-conviction review in a criminal case, we believe that word is most reasonably understood to refer to all of the consequences of conviction set forth in the judgment. The government has not offered, nor can we discern, any reason why district courts should hear challenges to the penal component of a sentence but not to assessments levied alongside that punishment as a result of a conviction. From the defendants' standpoint an assessment is virtually indistinguishable from a fine and we can perceive no reason why Congress would have wished to grant a post-judgment right to challenge the legality of the latter in the trial court and to deny a similar right to challenge the former. We conclude, therefore, that the district court had jurisdiction to hear defendants' claims.
 
 
 6
 The government next argues that if the district court had jurisdiction, this court has jurisdiction over the district court's final order under 28 U.S.C. Sec. 1291. We disagree again. As the government, in fact, concedes, our conclusion in Government of the Virgin Islands v. Douglas, 812 F.2d 822 (3d Cir.1987), that "Sec. 1291 is not generally available as a source of appellate jurisdiction over prosecutorial appeals of final orders" suggests that we have no jurisdiction over this matter. Notwithstanding that holding, the government argues that appeals from Rule 35 proceedings are sufficiently independent of the merits of a criminal prosecution to be appealable under Carroll v. United States, 354 U.S. 394, 77 S.Ct. 1332, 1 L.Ed.2d 1442 (1957). As explained in Government of the Virgin Islands v. Douglas, however, we believe the Carroll exception applies only to interlocutory orders. In this case, the government appeals from a final order of the district court vacating defendants' sentences to the extent of the special assessments. Because Carroll does not reach such final orders, this court has no appellate jurisdiction over the decision of the district court under 28 U.S.C. Sec. 1291.
 
 
 7
 Finally, the government urges alternatively that we should exercise our mandamus jurisdiction under 28 U.S.C. Sec. 1651. Though mandamus is "to be granted only in extraordinary cases," United States v. Olds, 426 F.2d 562, 565 (3d Cir.1970), we conclude that this is such a case. The government contends that Section 3013 is not constitutionally infirm, that it imposes a nondiscretionary duty upon sentencing judges to levy the special assessments, and therefore that the district court orders in these cases frustrate the intent of Congress. If the government's position is correct, the issuance of a writ of mandamus to the district court would be an appropriate remedy and unless we exercise our mandamus jurisdiction, the district court orders will go unreviewed. For these reasons, we conclude that we have jurisdiction under 28 U.S.C. Sec. 1651.
 
 III.
 
 8
 The government argues next that the district court judge should not have considered defendants' claim because Origination Clause challenges are nonjusticiable political questions under the test enunciated by the Supreme Court in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). That decision provides six criteria for judging when cases present political questions:
 
 
 9
 Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments of government.
 
 
 10
 Id. at 217, 82 S.Ct. at 710.
 
 
 11
 Contrary to the government's contention, none of these criteria are satisfied in cases involving an interpretation of the Origination Clause. First, nothing in the text of the Constitution commits to Congress the decision whether an act violates the Origination Clause. Second, cases that turn on constitutional interpretation generally do not involve judicially unmanageable standards. Powell v. McCormack, 395 U.S. 486, 549, 89 S.Ct. 1944, 1978, 23 L.Ed.2d 491 (1968). Moreover, the Supreme Court has already resolved several Origination Clause disputes, Millard v. Roberts, 202 U.S. 429, 26 S.Ct. 674, 50 L.Ed. 1090 (1906), Twin City Bank v. Nebeker, 167 U.S. 196, 17 S.Ct. 766, 42 L.Ed. 134 (1897), United States v. Norton, 91 U.S. 566, 23 L.Ed. 454 (1875); the Court there found the legal standards necessary to adjudicate such cases. Third, because this case turns on an interpretation of the Constitution, our resolution of the matter "falls within the traditional role accorded the courts to interpret the law and does not involve a 'lack of the respect due [a] coordinate [branch] of government,' nor does it involve an 'initial policy determination of a kind clearly for nonjudicial discretion.' " Powell v. McCormack, 395 U.S. 486, 548-49, 89 S.Ct. 1944, 1978-79 (quoting Baker v. Carr, 369 U.S. 186, 216, 82 S.Ct. 691, 709).[1] Fourth, because the courts are charged with ultimate responsibility for interpreting the Constitution, our decision regarding the claimed Origination Clause violation cannot result in "multifarious pronouncements by various departments on one question." Finally, section 3013's special assessment presents "no unusual need for unquestioning adherence to a political decision already made." This is not a context that demands that the government speak decisively and unequivocally. See Goldwater v. Carter, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) (four-justice plurality concluding that the termination of a mutual defense treaty with the Republic of China presents a nonjusticiable political question); Americans United for the Separation of Church and State v. Reagan, 786 F.2d 194 (3d Cir.) (holding that appointment of mission to Vatican is a nonjusticiable political question), cert. denied, 479 U.S. 914, 107 S.Ct. 314, 93 L.Ed.2d 288 (1986). Indeed, though a ruling in favor of the government might cause a diminution of the fund into which the special assessments are placed, nothing in such a decision would inhibit Congress' power to reestablish the assessments in compliance with the Origination Clause.
 
 
 12
 The claim that Origination Clause cases are nonjusticiable not only founders on Baker's six criteria, but also conflicts with numerous Supreme Court opinions that reach the merits of such disputes. Though none of those opinions address the political question doctrine, the fact that the Court resolved those disputes implies the justiciability of Origination Clause challenges.[2]IV.
 
 
 13
 Article I, Sec. 7 requires that "[a]ll Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills." The application of that clause to the Sec. 3013 special assessment raises two issues: (1) whether the Victims of Crime Act raises revenue within the meaning of the Origination Clause; and (2) if so, in which house of Congress did the Act originate. Because we conclude that the Victims of Crime Act does not raise revenue within the meaning of the Origination Clause, we express no opinion on the Act's origin.
 
 
 14
 On three occasions the Supreme Court has squarely addressed the meaning of the phrase "raising revenue" under the Origination Clause. Twin City Bank v. Nebeker, 167 U.S. 196, 17 S.Ct. 766, 42 L.Ed. 134 (1897), exemplifies that the line of cases. Twin City involved a challenge to the National Bank Act's requirement that "the expenses necessarily incurred in executing the provisions of this act ... shall be paid out of proceeds of the taxes or duties now or hereafter to be ... collected from associations organized under this act." Ch. 106, Sec. 41, 13 Stat. 99, 111 (1864) (codified as amended at 12 U.S.C. Sec. 541). After paying taxes levied under the Act's provisions, Twin City Bank sued the government on the grounds that the Act's taxing provision raised revenue and that the bill had originated in the Senate. The Court, writing through Justice Harlan, rejected the Origination Clause claim:
 
 
 15
 It is sufficient in the present case to say that an act of Congress providing a national currency secured by a pledge of bonds of the United States, and which, in furtherance of that object, and also to meet the execution of the act, imposed a tax on the notes in circulation of the banking associations organized under the statute, is clearly not a revenue bill which the Constitution declares must originate in the House of Representatives. Mr. Justice Story has well said that the practical construction of the Constitution and the history of the origin of the constitutional provision in question proves that revenue bills are those that levy taxes in the strict sense of the word, and are not bills for other purposes which may incidentally create revenue. The main purpose that Congress had in view was to provide a national currency based upon United States bonds, and to that end it was deemed wise to impose the tax in question.... There was no purpose by the act or by any of its provisions to raise revenue to be applied in meeting the expenses of obligations of the government.
 
 
 16
 Id. at 202-03, 17 S.Ct. at 768-69 (emphasis added).
 
 
 17
 The two other relevant Supreme Court opinions echo Twin City. In United States v. Norton, 91 U.S. 566, 23 L.Ed. 454 (1875), the Court upheld the Postal Money-Order Act though it imposed fees on purchasers of money orders in order to defray the program's costs. Similarly, in Millard v. Roberts, 202 U.S. 429, 26 S.Ct. 674, 50 L.Ed. 1090 (1906), the Court upheld an act providing for improvements to the District of Columbia's railroads which levied assessments on D.C. residents to cover a portion of the costs of the improvements. In both cases, the Court cited Justice Story's rule and concluded that the challenged acts did not raise revenue within the meaning of the Origination Clause. We take this line of cases to mean that acts which establish government programs and also impose taxes or fees to defray the costs of those programs do not raise revenue within the meaning of the Origination Clause so long as the ultimate purpose of the program is not to raise revenue for the general use of government.
 
 
 18
 To determine the purposes of the Victims of Crime Act and the special assessment, we look first to the statutory language. Edwards v. Aguillard, 482 U.S. 578, 594, 107 S.Ct. 2573, 2583, 96 L.Ed.2d 510 (1987). Though the Act contains no explicit statement of purpose, its provisions establish a scheme to provide funding to compensate and assist the victims of federal and state crimes. The Act assures the attainment of that objective by setting numerous requirements for recipients of collected funds. Crime victim compensation grantees must provide victims of crime and survivors of victims of crimes with compensation for medical expenses, lost wages and funeral expenses and must "promote[ ] victim cooperation with the reasonable requests of law enforcement authorities." 42 U.S.C. Sec. 10602(b). Crime victim assistance grantees must "demonstrate[ ] a record of providing effective services to victims of crime," and can spend program funds only on "(a) crisis intervention services; (b) providing, in an emergency, transportation to court, short-term child care services, and temporary housing and security measures; (c) assistance in participating in criminal justice proceedings; (d) payment of all reasonable costs of forensic medical examination of a crime victim...." 42 U.S.C. Sec. 10603(d)(2). Funds spent to assist victims of federal crimes carry similar limitations. Based on these restrictions, we conclude that Congress intended the Victims of Crime Act and the special assessment to provide a scheme for victim compensation and assistance, not to raise revenue.
 
 
 19
 Examination of the Act's legislative history bolsters that conclusion. The report of the Senate Committee on the Judiciary on the Act declares,
 
 
 20
 [t]he purposes of the Act are five:
 
 
 21
 (1) To establish a special fund in the United States Treasury to finance payments to State and Federal victims compensation and assistance programs;
 
 
 22
 (2) To encourage States to provide assistance to victims of crime within their borders regardless of the victim's residence or the jurisdiction of the crime;
 
 
 23
 (3) To assist local government and private nonprofit organizations in providing direct services to victims of crime and to promote national development of comprehensive victims services;
 
 
 24
 (4) To create a safe and welcome environment for victims who will be involved in the criminal justice process; and
 
 
 25
 (5) To improve Federal assistance to victims of Federal crime.
 
 
 26
 S.Rep. No. 98-497, 98th Cong., 2d Sess. 4-5 (1984), U.S.Code Cong. & Admin.News 1984, pp. 3182, 3610-11 [hereinafter Senate Report]. Nothing in the text of the Act nor in its history suggests that this declaration was inaccurate and that Congress actually intended the Act to raise money for its general use. On the contrary, the Victims of Crime Act and special assessment virtually mirror the statutes approved in Twin City, Norton, and Millard. Nor do we believe that the fact that the program established by the Act involves a fund deprives this analogy of force. Nothing in those cases suggests that the federal government must implement the ultimate purposes of such statutes; the Victims of Crime Act employs a funding device only because Congress wished state and private agencies to carry out its professed goals. We therefore conclude that the Act does not raise revenue within the meaning of the Origination Clause.
 
 
 27
 The district court in this case and the Court of Appeals for the Ninth Circuit, United States v. Munoz-Flores, 863 F.2d 654 (1988), examined these cases and held that the special assessment imposed under the Victims of Crime Act violated the Origination Clause. We disagree with the reasoning of both. First, the district court mistakenly concluded that our opinion in United States v. Donaldson, 797 F.2d 125 (3d Cir.1986), stands for the proposition that the special assessment raises revenue within the meaning of the Origination Clause. Donaldson held that the rule of lenity did not apply to Sec. 3013 because Congress did not establish the special assessment to punish criminals, but rather to generate funds for the victim assistance program. Id. at 127. It does not follow from that holding, however, that the special assessment raises revenue for Origination Clause purposes. The Supreme Court cases discussed above make clear that a bill does not raise revenue under art. I, Sec. 7 simply because it contains a provision whose express purpose is to generate funds to defray the costs of the program established by the bill. Because the program funded by the special assessment does not raise revenue, the assessment itself withstands an Origination Clause challenge and nothing in Donaldson dictates otherwise.
 
 
 28
 Second, the Ninth Circuit's decision in United States v. Munoz-Flores claims that the Act's legislative history indicates that "the primary purpose of the special assessment was to raise revenue, not to finance state victim assistance programs...." 863 F.2d at 660. In reaching that conclusion, the court pointed to three factors:
 
 
 29
 [A]s the underlined passage of the statement of purpose indicates,[3] Congress contemplated that the revenue might be used as general federal revenue. In addition, Congress failed to restrict the use of the monies assessed under section 3013 in any way, so that they might be shifted to another purpose at any time. A final indication of the fact that the special assessment's main purpose was not to fund victim-assistance programs is the concession by Congress in its statement of purpose that only small amounts would be collected by the assessments.
 
 
 30
 Id. at 859. We disagree with all three of these statements and comment on each in reverse order. First, we fail to see the logic in the assertion that because the assessment would not raise substantial sums, its purpose was to raise revenue. Quite the contrary, the fact that the assessment could not defray all costs associated with the fund suggests that Congress did not intend to fill the government's general-fund coffers with special assessment booty.
 
 
 31
 Second, although the Munoz-Flores court viewed the Victims of Crime Act as failing "in any way" to restrict the expenditure of assessments, the statute seems to us to include substantial restrictions on the expenditure of collected funds. The Act first provides a list of fines, among them the Sec. 3013 special assessments, to be placed in a separate account in the Treasury called the Crime Victims Fund. 42 U.S.C. Sec. 10601(b). It then specifies that of the total amount collected in any given year, half shall be disbursed to crime victim compensation programs and half to crime victim assistance programs. 42 U.S.C. Sec. 10601(d)(2). In order to be eligible for such grants, the Act requires, among other things, that grantees compensate victims for the costs attributable to physical or mental injury, lost wages or funeral expenses, or that they provide services to crime victims (particularly victims of sexual assault, spouse abuse or child abuse). The Act further provides that the Attorney General may, at his discretion, withhold five percent of any year's grants (to be deducted from the grants to victim assistance programs) to provide services to victims of federal crimes. 42 U.S.C. Secs. 10602-03. For us, these restrictions corroborate the drafters' statements that the purpose of the special assessment was to provide compensation and assistance to crime victims, not to raise money for the general use of the government.
 
 
 32
 We acknowledge that there are two limitations in the statute which arguably cut against the conclusion that we reach: one places a $100 million cap on the Crime Victims Fund and a second terminates all contributions to that Fund after September 30, 1988. While these provisions merit further discussion, we do not believe they convert the Act into a revenue raising measure. Section 1402(c)(1) of the Act stipulates that "[i]f the total deposited in the Fund during a particular fiscal year reaches the sum of $100 million, the excess over that sum shall be deposited in the general fund of the Treasury and shall not be part of the fund." Therefore, as to collections above $100 million, the Ninth Circuit's conclusion that the Act placed no restriction on the expenditure of the assessments is correct. The question is whether the absence of restrictions on funds above the cap demonstrates that the "main purpose" of the Act was to raise revenue. Twin City Bank v. Nebeker, 167 U.S. 196, 203, 17 S.Ct. 766, 769, 42 L.Ed. 134 (1897). Were it the case that Congress should have expected all of the collections under the Act, including those from special assessments, to far exceed the $100 million annually, this would provide substantial support for the conclusion reached by the court in Munoz-Flores. Though evidence on this question is sparse, all that we have found suggests that Congress anticipated total collections of less than $100 million. A Congressional Budget Office report on the cost of the Act concluded that "deposits into the fund could conceivably range up to the $100 million ceiling imposed by the bill, as reported by the committee."[4] Though not dispositive, the CBO's report, which was included in the Senate's report on the bill, tends to undermine the suggestion that Congress passed the Act for the purpose of filling the government's general-fund coffers. Moreover, the conclusions of the Munoz-Flores court notwithstanding, nothing in the Act or its legislative history affirmatively suggests any purpose behind the Act other than to subsidize victim assistance programs. We therefore conclude that the cap was not intended to disguise the raising of revenue for general government use, but rather to put a ceiling on the size of the victim assistance program, with the understanding that some small portion of collected fines and assessments might be placed in the general fund of the Treasury as a result of the cap.
 
 
 33
 Section 1402(c)(2) places a second restriction on the fund by prohibiting deposits into the Fund after September 30, 1988. This provision was later amended to allow deposits through September 1994. It is not clear whether Congress also intended the Sec. 3013 special assessment provision to lapse after the specified date or whether it merely intended that all assessments would thereafter become part of the general fund of the Treasury. The importance of this distinction is that under the latter interpretation, the Act places no restriction on the expenditure of collected fines after the specified date, and thus adds to the evidence suggesting that Congress may have intended the Victims of Crime Act to raise revenue. The Senate report on the bill states only that "[section 1402(c)(2) ] imposes a 'sunset date' of September 30, 1988, after which no deposit could be made into the fund without Congressional [sic] authorization. Unobligated funds would revert to the general fund of the Treasury at that time. This will enable the Congress to reevaluate the program and make any necessary improvements." Senate Report at 13, U.S.Code Cong. & Admin.News 1984, p. 3619.
 
 
 34
 Because we conclude that the Act does not raise revenue even if interpreted to continue the collection of assessments after the prohibition on new deposits in the Fund, we need not resolve the Act's ambiguity. According to the Senate report, the "sunset" provision was intended to force congressional reconsideration of the victim assistance program after several years of operation by cutting its funding. Though once the sunset date lapsed, assessments might continue to be collected and then deposited in the general fund of the Treasury, that appears to be an incidental by-product of the deadline's principal function. Indeed, the subsequent history of the Act bolsters this interpretation. In 1988, Congress reexamined the program and amended the Act by increasing the dollar ceiling on the fund and setting a new sunset date of September 30, 1994. Though the amendment was not approved until November 18, 1988, some three weeks after the original sunset date, Congress explicitly declared that the amount that would have been placed in the fund but for the prohibition on deposits be transferred from the general fund of the Treasury to the Crime Victims Fund. We are not suggesting that subsequent acts by Congress can cure an Act's violation of the Origination Clause, but rather that they reflect that the purpose of the original Act's sunset provision was to force Congress' hand, not to raise revenue.
 
 
 35
 Finally, the Munoz-Flores court suggests that one of the statements of the Act's drafters reveal their true revenue raising purpose. The culpable quotation, taken from the Senate report on the bill, reads:
 
 
 36
 The purpose of imposing nominal assessment fees is to generate needed income to offset the cost of the [victim's assistance fund] authorized under S. 2423. Although substantial amounts will not result, these additional amounts will be helpful in financing the program and will constitute new income for the federal government.
 
 
 37
 Senate Report at 13-14, U.S.Code Cong. & Admin.News 1984, pp. 3619-3620 (emphasis added). Presumably, the court in Munoz-Flores felt that the last eight words of the passage indicated that Congress saw the measure as a means of providing funds for the government's general uses. We find that interpretation strained. In the first place, the quotation begins by declaring that the intent of the fee is to defray the costs of victim assistance and compensation. Given that declaration, we believe that the italicized portion of the quotation conveys the notion that but for the assessment, the federal government would have been forced to find another source for its program, presumably the general fund of the Treasury. Secondly, it is noteworthy that the quoted passage relates to the special assessment and not to the other funds generated by the Act. Because the special assessment was expected to generate only a small fraction of the amount necessary to fund the project, it seems unlikely that the drafters hoped that the assessments would both fund the project and raise additional revenue for the government.
 
 
 38
 For all of these reasons, we conclude that Congress passed the Victims of Crime Assistance Act not to raise revenue, but for the reasons the drafters professed--to assist and compensate the victims of crime. Because the defendants' Origination Clause challenge fails on this ground, we need not reach the issue of the Act's origin. The government's petition for a writ of mandamus will be granted; the district court will be instructed to vacate its order and reimpose the assessments. The appeals in Nos. 89-3180 and 89-3181 will be dismissed for want of appellate jurisdiction.
 
 
 
 [1]
 In Powell, Congress had purported to expel one of its members. In the course of holding that the "90th Congress' denial of membership to Powell [could] not [constitutionally] be treated as an expulsion," 395 U.S. at 550, 89 S.Ct. at 1979, the Supreme Court rejected an argument that "the case present[ed] a political question because judicial resolution of petitioner's claim would produce a 'potentially embarrassing confrontation between coordinate branches' of the Federal Government." Id. at 548, 89 S.Ct. at 1978. We believe adjudication of the case now before us would create little, if any, risk of such a confrontation; certainly, this case poses a less sensitive issue from this perspective than the one presented in the Powell case
 
 
 [2]
 Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892) does not conflict with our holding on this issue. Field involved a challenge to a statute on the ground that the version of the act signed by the President excluded provisions that had been included in the bill as passed by the House of Representatives. The Court held that it could not question the authenticity of an act certified by the President of the Senate and the Speaker of the House, and signed by the President on account of the "respect due coequal and independent departments ..." Id. at 672, 12 S.Ct. at 497. The Court carefully limited its holding to the issue of authentication, declaring that the courts remained bound "to determine, when the question properly arises, whether the act, so authenticated, is in conformity with the Constitution." Id. Nothing that we are asked to do in this case would involve the lack of respect for a coequal branch that a rejection of the authentication in Field would have exhibited
 The timing of the Court's decisions on Origination Clause challenges lends additional support to this view of Field v. Clark. Field was decided in 1891 in an opinion written by Justice Harlan. Twin City Bank v. Nebeker, 167 U.S. 196, 17 S.Ct. 766, 42 L.Ed. 134 (1897), decided six years later, again in an opinion by Justice Harlan, not only provides clear guidance for resolving the merits of Original Clause disputes, but also discusses Field v. Clark at length. Therefore, one would be hard pressed to argue that the Court felt that it could or should not resolve such disputes by virtue of Field.
 
 
 [3]
 The court is referring to the section-by-section analysis portion of the Senate report on the bill. The discussion of the special assessment provision reads in part as follows:
 The purpose of imposing nominal assessment fees is to generate needed income to offset the cost of the [victim's assistance fund] authorized under S. 2423. Although substantial amounts will not result, these additional amounts will be helpful in financing the program and will constitute new income for the Federal government.
 Munoz-Flores, 863 F.2d at 658 (quoting Senate Report at 13-14, U.S.Code Cong. & Admin.News 1984, pp. 3619-3620).
 
 
 [4]
 The full text of the report reads:
 The Committee on the Judiciary estimates that S. 2423 will not cost in excess of $100 in each of Fiscal years 1985, 1986, 1987, and 1988.
 The Administration indicated in testimony before the Committee that most recent figures on criminal fines indicate that just under $72 million dollars in fines was collected in Fiscal year 1983. However, it is unclear whether all such fines would be subject to deposit in the Fund under S. 2423. The administration expected that under current law, this source would provide approximately $45 million to $75 million for the Fund in its first year.
 The Administration's estimates did not take into account three of the improvements contained in S. 2423, as amended by the Committee. While the estimates apparently envision improved collection procedures, they do not seem to include across-the-board fine increases, penalty assessment fees, and public donations. Thus, deposits into the fund could conceivably range up to the $100 million ceiling imposed by the bill, as reported by the Committee.
 While the bill would authorize new spending, the increased fines, improved collections, penalty assessment fees, and public donations could conceivably offset much of that spending authority.
 Id. at 21. We confess some puzzlement about the above report's implication that the Act could generate expenses greater than the total fines collected. As we read the statute, only collected fines could be disbursed, thus eliminating the possibility that the government could spend more than it collected. Nevertheless, the implication of the report is that Congress did not expect collections to substantially exceed the $100 million cap.