UNITED STATES of America, Plaintiff–Appellee,

v.

Joe Jeffrey ERVES, Gerald Wayne Drew, Gerry Lewayne Terrell, Donald J. Richardson, Defendants–Appellants.

UNITED STATES of America, Plaintiff–Appellee,

v.

Andrew VILLARREAL–FARIAS, Defendant–Appellant.

Nos. 88–8368, 88–8494.

United States Court of Appeals, Eleventh Circuit.

Aug. 10, 1989.

P. Bruce Kirwan, Atlanta, Ga., for Erves.

Stephen T. Maples, Decatur, Ga., for Drew.

Jake Arbes, Atlanta, Ga., for Terrell.

Jake Waldrop, Federal Defender Program, Inc., Atlanta, Ga., for Richardson.

Candiss L. Howard, Julie E. Carnes, Asst. U.S. Attys., Atlanta, Ga., for U.S. in No. 88–8368.

Paul H. Kehir (Court appointed), Snellville, Ga., for Villarreal–Farias.

Lawrence O. Anderson, Julie Carnes, Asst. U.S. Attys., S.E. Drug Task Force, Atlanta, Ga., for U.S. in No. 88–8494.

Before RONEY, Chief Judge, FAY, Circuit Judge, and ALLEN *, Senior District Judge.

RONEY, Chief Judge:

These criminal appeals though factually unrelated, were consolidated because they shared common issues about the constitutionality of the sentencing guidelines promulgated by the United States Sentencing Commission. The defendants also raise statutory challenges to the guidelines and claims that the district court incorrectly applied them. We affirm.

## Facts

### Erves, Drew, Terrell, and Richardson

Around December 1, 1987, defendant Donald Richardson contacted David Panek, an undercover agent for the Drug Enforcement Administration (DEA), in an effort to sell him two kilograms of cocaine. When Panek agreed to the purchase, Richardson, in order to obtain the cocaine, spoke to Joe Erves, who in turn contacted Gerry Terrell. Initially, Terrell was reluctant to assist Erves. Eventually, however, Terrell introduced Erves to Gerald Wayne Drew.

A few days later, Drew brought the cocaine to a car wash, where he met Terrell. Drew transferred the cocaine from his vehicle to the trunk of Terrell's automobile. Then Terrell, followed by Drew, drove to a K–Mart parking lot where Richardson, Erves, and Panek were waiting. When Terrell opened his trunk and showed the cocaine to Panek, other DEA agents nearby responded to a prearranged signal from Panek and arrested the four defendants. The agents recovered slightly less than two kilograms of 92 percent pure cocaine.

The Grand Jury indicted each defendant for conspiracy and possession with intent to distribute. The Government reached plea agreements with them whereby each agreed to plead guilty to conspiracy and to testify against his codefendants, if necessary. Each then pled guilty, and the court sentenced Drew to 78 months, Richardson to 51 months, Erves to 41 months, and Terrell to 18 months.

### Villarreal–Farias

In December 1987 Timothy Reardon began negotiating with undercover DEA agents for the sale of 10 kilograms of cocaine and 150 pounds of marijuana. Reardon sought assistance from Villarreal–Farias in acquiring the cocaine (approximately $250,000 worth) to sell to the agents, believed to be drug buyers from Chicago.

Villarreal–Farias enlisted the help of Hector Lopez of Austin, Texas. Subsequently, Villarreal–Farias traveled between Atlanta and Texas. In Texas he and Lopez unsuccessfully attempted to obtain the 10 kilograms. When it became clear that Villarreal–Farias could not acquire the cocaine, he and Reardon agreed to "string along" the proposed buyers so that Reardon would at least have a market for his marijuana. The agents had indicated that they would abandon the deal and return to Chicago unless the intended purchase was forthcoming. The conspiracy ended in Atlanta with the delivery of the marijuana to the agents. Although present at the delivery, Villarreal–Farias later contended that he had not participated in the marijuana transaction, but he admitted that he expected to receive $5,000 from the sale for his role in keeping the buyers interested.

A multi-count indictment charging a conspiracy and related drug offenses was later returned against Villarreal–Farias, Reardon, and others. Pursuant to a plea agreement, Villarreal–Farias pled guilty to two charges, one for traveling in interstate commerce to facilitate unlawful narcotics activity and the second for using a communication facility to facilitate the conspiracy. He received concurrent sentences of 60 and 48 months.

---

* Honorable Charles M. Allen, Senior U.S. District Judge for the Western District of Kentucky, sitting by designation.

### Constitutional Challenges

The defendants argue that application of the sentencing guidelines is unconstitutional because the Sentencing Reform Act of 1984 improperly delegated an essentially legislative role to the Sentencing Commission to promulgate the guidelines and violated the separation of powers doctrine by including Article III judges on the Commission and, further, because the guidelines which were ultimately adopted created a sentencing scheme which was so mechanical, rigid, and restrictive of the judge's discretion as to deny due process.

The Supreme Court recently upheld the guidelines against these delegation and separation of powers arguments in *Mistretta v. United States*, — U.S. —, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989).

Although *Mistretta* did not involve a due process challenge to the guidelines, with virtual unanimity the federal circuits have rejected both procedural and substantive due process challenges. *E.g.*, *United States v. Allen*, 873 F.2d 963 (6th Cir.1989); *United States v. Seluk*, 873 F.2d 15, 16 (1st Cir.1989); *United States v. Brittman*, 872 F.2d 827, 828 (8th Cir.1989); *United States v. Vizcaino*, 870 F.2d 52, 54–56 (2d Cir. 1989); *United States v. White*, 869 F.2d 822, 825 (5th Cir.1989); *United States v. Frank*, 864 F.2d 992, 1008–10 (3d Cir.1988).

▮▮ As to procedural due process, "only minimal due process protections" are required at sentencing. *United States v. Darby*, 744 F.2d 1508, 1537 (11th Cir.1984), *cert. denied*, 471 U.S. 1100, 105 S.Ct. 2322, 85 L.Ed.2d 841 (1985). Generally, due process concerns at the sentencing stage are that the punishment not be based on unreliable information, *see Townsend v. Burke*, 334 U.S. 736, 740–41, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948), or result from retaliation for exercising a constitutional right, *see North Carolina v. Pearce*, 395 U.S. 711, 723–25, 89 S.Ct. 2072, 2080–81, 23 L.Ed.2d 656 (1969). The guidelines do not undermine either of these concerns. Instead, they tend to increase procedural protections by limiting judicial discretion and more clearly focusing the relevant aggravating and mitigating factors for sentencing.

▮▮ A substantive due process challenge must also fail. There is generally no constitutional right to individualized sentencing in a non-capital case. *See United States v. Frank*, 864 F.2d at 1009–10. We have upheld *mandatory* sentencing provisions against constitutional challenges. *E.g.*, *United States v. Holmes*, 838 F.2d 1175, 1177 (11th Cir.) (held that a mandatory minimum sentencing provision did not deny due process), *cert. denied*, — U.S. —, 108 S.Ct. 2829, 100 L.Ed.2d 930 (1988); *Smith v. United States*, 284 F.2d 789, 791 (5th Cir.1960) (held that a "mandatorily fixed and specific" 25–year sentence was constitutional). If, despite their inflexibility, mandatory sentencing provisions withstand due process scrutiny, so too must the sentencing guidelines. *United States v. White*, 869 F.2d at 825 ("If Congress can remove the sentencing discretion of the district courts, it certainly may guide that discretion through the guidelines.") The guidelines allow a measure of discretion within a specified range in all cases and, under exceptional circumstances, provide a vehicle for departure from the normally prescribed punishment range.

### Statutory Challenges

Defendant Gerald Wayne Drew contends that the guidelines are invalid due to inadequate compliance with the statutory requirements:

(A) that the General Accounting Office (GAO) undertake a study and report to Congress on the projected impact of the guidelines,

(B) that the Sentencing Commission assess the effect that the guidelines would have on the federal prison population, and

(C) that the guidelines reflect the general inappropriateness of imprisonment for first-time offenders.

### A. *The GAO Report*

▮▮ Under the terms of the Sentencing Reform Act, the guidelines would not go

into effect before six months after the submission to Congress of the Commission's recommended guidelines and a report stating the reasons for its recommendations. The GAO was to study the proposed guidelines and their potential impact on the existing sentencing and parole release system and report the results to Congress within 150 days of the Commission's report. Sentencing Reform Act of 1984, Pub.L. 98–473, 98 Stat. 2031, 2032, § 235(a)(1)(B)(ii).

These reports were simply to aid Congress in evaluating the guidelines. Deciding whether the reports were sufficient to facilitate the legislative task of evaluating the proposed guidelines was a congressional determination, a legislative judgment call. Determining whether reports to Congress are adequate to enable it to do its job is not the role of the Judicial Branch. This was "essentially a political question outside the province of the judiciary." *United States v. White,* 869 F.2d at 829.

### B. *The Prison Population*

■ Congress directed that in formulating the guidelines the Commission was to "take into account the nature and capacity of the penal, correctional, and other services available" and "to minimize the likelihood that the Federal prison population will exceed the capacity of the federal prisons, as determined by the Commission." 28 U.S.C.A. § 994(g).

The *principal* aims of the Sentencing Reform Act of 1984 were to remedy the disparities in sentencing and the uncertainties of the parole system, *see Mistretta,* 109 S.Ct. at 651–52, not to address prison overcrowding. In fact, Congress found that pre-guidelines sentences sometimes "d[id] not accurately reflect the seriousness of the offense." 28 U.S.C.A. § 994(m). Congress contemplated that accomplishing the Act's aims might increase the population of federal prisons, so the Commission was instructed to recommend "any change or expansion in the nature or capacity of such facilities and services that might become necessary as a result of the guidelines." 28 U.S.C.A. § 994(g).

Congress' intent was not to prohibit any increase in the federal prison population. Section 994(g) does not operate as a prohibition, but rather as a directive that when formulating the guidelines the Commission keep in mind the effects they may have on available resources. *United States v. White,* 869 F.2d at 828. The Commission complied with this directive. *See Supplementary Report on the Initial Sentencing Guidelines and Policy Statements* 62–75 (June 18, 1987).

### C. *First–Time Offenders*

■ The enabling legislation for the guidelines provided, in relevant part:

The Commission shall insure that the Guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or *an otherwise serious offense....*

28 U.S.C.A. § 994(j) (emphasis added).

As a threshold matter, it is questionable whether Drew's role in the conspiracy could reasonably be characterized as sufficiently non-serious to allow him to invoke section 994(j). Nonetheless, the guidelines are generally consistent with this section's instruction to the Commission. When read together, the guidelines' sentencing table (Guidelines, Chap. 5 at 5.2) and the probation guidelines (Guidelines § 5B1.1) allow probation without any period of confinement for the first six offense levels for a first time offender, and probation with a confinement condition, either intermittent or community confinement, for four additional levels. The guidelines thus *do* reflect the general appropriateness of non-incarceration for non-serious crimes.

### *Guidelines Application Challenges*

Defendants Richardson, Terrell, and Villarreal–Farias challenge the manner in which the district court applied the guidelines to them.

■ A court of appeals has authority to review a sentence imposed under the guidelines to determine whether it is "imposed in violation of law," is an "incorrect applica-

tion" of the guidelines, or is "outside the range of the applicable sentencing guideline, and is unreasonable." 18 U.S.C.A. § 3742(d). The sentencing court's findings of fact must be accepted unless they are "clearly erroneous." *Id.* The court's determination of a defendant's role in a crime is a finding of fact to which the clearly erroneous test applies. *See United States v. Buenrostro,* 868 F.2d 135, 137 (5th Cir. 1989).

### Richardson

■ Richardson argues that the district court misapplied the guidelines in refusing to give him a two-level reduction for his allegedly "minor" role in the offense. The guidelines on which he relies state:

§ 3B1.2. Mitigating Role

Based on the defendant's role in the offense, decrease the offense level as follows:

(a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.

(b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.

In cases falling between (a) and (b), decrease by 3 levels.

In promulgating section 3B1.2, the Commission intended for a "minor" participant to be one "less culpable than most other participants, but whose role could not be described as minimal." Guidelines § 3B1.2, Commentary, Application Note 3. This guideline provision was meant to designate a "range of adjustments for a defendant who plays a part in committing the offense that makes him *substantially less culpable than the average participant.*" *Id.,* Commentary, Background (emphasis added).

Although the Government recommended that Richardson's role be treated as minor, the district court's refusal to find he was a minor participant, while finding Erves and Terrell were, was not clearly erroneous. The court correctly noted that Richardson was the "instigator" of the crime. He approached Panek and arranged the sale. Then, by speaking to Erves, Richardson initiated the chain of communications necessary to find a source of cocaine. The record thus supports the finding that Richardson was more culpable than Erves or Terrell. Richardson, accordingly, was not entitled to a section 3B1.2 reduction because he was not "substantially less culpable than the average participant."

### Terrell

■ Terrell contends that the court erred in refusing to grant him probation. Generally, "the severity of a sentence imposed within the statutory limits is insulated from appellate review." *United States v. Roper,* 681 F.2d 1354, 1361 (11th Cir. 1982), *cert. denied,* 459 U.S. 1207, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983). Terrell's sentence is concededly within the statutory limits.

Title 18 U.S.C.A. § 3742(a), however, establishes exceptions to the general rule of non-reviewability and allows a defendant to appeal a sentence (1) imposed in violation of law, (2) resulting from an incorrect application of the guidelines, (3) exceeding the applicable guideline range, or (4) constituting a "plainly unreasonable" sentence, where no guideline range is applicable.

Due to Terrell's substantial assistance, the Government recommended a downward departure for him, although it opposed probation. The record indicates that, making the appropriate adjustments for his minor role and acceptance of responsibility, his applicable guideline sentencing range was 41 to 51 months.

In response to Terrell's request for probation, the judge stated that if this were not a case to which the guidelines applied, he "would probably consider probation" for Terrell. The courtroom colloquy between defense counsel Jake Arbes and the court, however, plainly indicated that although the court understood that it had authority to grant probation, the court thought that such a large departure was inappropriate:

The Court: What I'm saying is I do not believe that I would in good conscience reduce it ... down to probation.

Mr. Arbes: That you wouldn't or you can't.

The Court: That I would not. No I think—I think I would have the authority to do so....

. . . .

I don't see how you can consider them [the guidelines] in a vacuum. I think you have got to consider them ... in the context of the penalty involved and also the Government's position.

This clearly is not a case where the court failed to exercise its authority because it mistakenly thought it had none. Rather, it made a downward departure to 18 months, but chose not to depart as far downward as Terrell wanted. The issue presented is thus not whether the sentence was based on an incorrect application of law, but instead whether the court erred in not departing farther than it did. Terrell's appeal of his sentence does not fit within any of the categories of 18 U.S.C.A. § 3742(a). He, accordingly, has no ground for appeal under section 3742(a) because that section does not authorize an appeal on the ground that a favorable departure should have been even more favorable.

### Villarreal–Farias

■ Villarreal–Farias argues that the court erroneously applied the guidelines to him by adding a two-level enhancement allegedly based on an incorrect, implicit finding about the role he played in his offense. The district court determined that in sentencing him for interstate travel to facilitate a narcotics offense which was not ultimately consummated, the base offense level calculation would reflect the negotiating amount (10 kilograms of cocaine). This was correct. *See* Guidelines § 2D1.4, Commentary, Application Note 1 ("If the defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount.").

The court, however, credited Villarreal–Farias' account that he was just "puffing" and was unable to deliver 10 kilograms of cocaine. So it decided on a downward de-

parture from the applicable base level of 32, but stated an unwillingness to consider a departure below level 22. Ultimately, the judge, noting Villarreal–Farias' ongoing drug involvement and demonstrated willingness in attempting to obtain the cocaine requested, departed to level 24. Thus, the court did not *enhance* the sentence under guidelines section 3B1.1 (which in some circumstances requires enhancements for upper level participants in a crime), as Villarreal–Farias alleges, but rather gave him the benefit of a downward departure.

The sentence was not in violation of law. We have already rejected Villarreal–Farias' constitutional challenges to the application of the guidelines. He does not contend that his sentence exceeded the statutory limit. There was an applicable guideline range, but he received a sentence more favorable than the range of punishments which the guidelines provided. He, like Terrell, has no ground for appeal under section 3742(a), which does not authorize an appeal on the ground that a more favorable departure should have been granted.

AFFIRMED.