**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Edward THOLL, Defendant–Appellant.**

No. 89–1692.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 19, 1989.

Decided Feb. 15, 1990.

As Amended Feb. 21, 1990.

Stephen J. Liccione, Asst. U.S. Atty. (argued), Milwaukee, Wis., for plaintiff-appellee.

Waring R. Fincke (argued), Dvorak & Fincke, Milwaukee, Wis., for defendant-appellant.

Before RIPPLE, MANION and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.

Edward Tholl was convicted under 18 U.S.C. § 912 of obtaining money and property by impersonating a Drug Enforcement Administration (DEA) agent. Pursuant to a plea agreement, Mr. Tholl pleaded guilty and was sentenced to 18 months' imprisonment, ordered to make restitution of the funds taken in the bogus drug raids, and fined $2500. Mr. Tholl also was charged $50 under the special penalty assessment provision of 18 U.S.C. § 3013. On appeal, Mr. Tholl renews several objections to his sentence imposed under the Sentencing Guidelines and challenges the guidelines on constitutional grounds. For the following reasons, we affirm.

## I

## BACKGROUND

The essential facts are undisputed. Edward Tholl and his brother were engaged in an elaborate scheme to defraud drug dealers by posing as DEA agents and conducting bogus "raids," "arrests," and "searches" of dealers in Milwaukee, Wisconsin. To facilitate the scheme, the Tholls obtained false DEA badges, credentials, blank search warrant applications, and blank informant agreements. Thus equipped, the Tholls, posing as DEA agents, would "raid" a drug dealer's residence, "arrest" the dealer, "search" his house, and confiscate any money or drugs in the house. During the course of these searches, the Tholls would threaten to take the unwitting victim "downtown" unless he agreed to cooperate with them. The Tholls then would explain to the victim that he could have this "arrest" expunged from his record by agreeing to assist them in identifying other drug houses where similar raids could be conducted. To memorialize this "agreement," the Tholls would have the victim sign a form obligating him to render such "cooperation" for a one-year period.

The Tholls were arrested on July 27, 1988, after one of their search victims, Dale Prout, became suspicious and called the true DEA. On July 25, 1988, the Tholls had conducted a "raid" on Mr. Prout's residence, "arrested" Mr. Prout, and seized approximately 3 ounces of marijuana and $380 in cash. The Tholls also had induced Mr. Prout to sign an "informant" agreement and, after threatening him with being "taken into custody" or "taken downtown," had driven him around the area to identify other drug houses. Mr. Prout identified two other houses. Mr. Prout's tip to the true DEA led to the discovery that at least three other houses in the area had been raided that week by men matching the Tholls' description. On July 27, 1988, with Mr. Prout's assistance, the DEA staged its own fake drug transaction, and Mr. Prout made sure that the Tholls were advised of the time and location of the transaction. Although the Tholls did not attempt to "bust" the staged DEA transaction in progress, they monitored the transaction from their parked vehicle and were arrested as they started to follow the car that carried the proceeds of the staged transaction. Tr. 21 at 23.[1] A post-arrest search of the Tholls' vehicle and residence uncovered the false DEA credentials and other paraphernalia connected with the scheme.

Mr. Tholl admitted that he had engaged in four of these raids with his brother, but pursuant to a plea agreement the Tholls were charged with only one count—the July 25, 1988 raid on Mr. Prout's residence.

---

1. Although Mr. Tholl contended that he and his brother simply were attempting to leave the parking lot rather than follow the DEA car, Tr. 21 at 24–25, this dispute is immaterial because the Tholls were charged only with the raid on Mr. Prout's residence.

On January 9, 1989, Mr. Tholl appeared before the district court and entered a guilty plea. The district court ordered a presentence investigation and report. After reviewing the report, Mr. Tholl filed motions requesting that the district court declare the guidelines unconstitutional as a violation of due process and that it strike down the special penalty assessment imposed under 18 U.S.C. § 3013 as a violation of the origination clause of article I, section 7 of the United States Constitution. Mr. Tholl also challenged the district court's application of several specific guidelines provisions. The district court rejected these arguments, sentenced him to 18 months' imprisonment, ordered restitution of the funds taken in the bogus drug raid, and imposed a fine of $2500. Mr. Tholl also was charged $50 under the special penalty assessment. The judgment was entered on March 23, 1989, and on March 30, 1989, Mr. Tholl filed a timely notice of appeal.[2]

II

ANALYSIS

A. *Due Process Challenge to the Guidelines*

■ Mr. Tholl contends that the operation of the Sentencing Guidelines violates due process by depriving him of an individualized sentence. This argument, however, has been foreclosed by our recent decision in *United States v. Pinto,* 875 F.2d 143 (7th Cir.1989). In *Pinto,* we joined a growing number of circuits in holding that a sentence imposed pursuant to the guidelines does not deprive a defendant of due process.[3] We noted that, because the guidelines do take into account offender and offense characteristics, they do not deprive a defendant of an individualized sentence. *Pinto,* 875 F.2d at 144–45. We also explained that even if the guidelines did deprive a defendant of an individualized sentence, such deprivation would not violate due process because a defendant in a noncapital case is not constitutionally entitled to an individualized sentence. *Id.* at 145. Thus, under *Pinto,* we must reject Mr. Tholl's due process challenge to the guidelines.

B. *Origination Clause Challenge to the Special Penalty Assessment of 18 U.S.C. § 3013*[4]

■ Pursuant to the special assessment

---

2. We have jurisdiction under 18 U.S.C. § 3742(a)(1) and (2) to consider Mr. Tholl's appeal. These provisions enable a defendant to appeal a sentence as "imposed in violation of law" or "imposed as a result of an incorrect application of the sentencing guidelines." Mr. Tholl's constitutional challenges to the guidelines allege that his sentence was "imposed in violation of law," and his challenge to the application of guidelines §§ 3A1.3 and 3B1.2 is a claim that his sentence was "imposed as a result of an incorrect application of the sentencing guidelines." However, we lack jurisdiction to hear Mr. Tholl's appeal that the district court failed to depart from the guidelines range in refusing to apply policy statement § 5K2.10. *See United States v. Franz,* 886 F.2d 973, 980 (7th Cir.1989).

3. *See United States v. Brady,* 895 F.2d 538, (9th Cir.1990); *United States v. Thomas,* 884 F.2d 540, 542–44 (10th Cir.1989); *United States v. Erves,* 880 F.2d 376, 379 (11th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 416, 107 L.Ed.2d 381 (1989); *United States v. Jacobs,* 877 F.2d 460, 462 (6th Cir.1989); *United States v. Bolding,* 876 F.2d 21, 22–23 (4th Cir.1989); *United States v. Seluk,* 873 F.2d 15, 16–17 (1st Cir.1989) (per curiam); *United States v. Brittman,* 872 F.2d 827, 828 (8th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 184, 107 L.Ed.2d 140 (1989); *United States v. Vizcaino,* 870 F.2d 52, 53–56 (2d Cir. 1989); *United States v. Frank,* 864 F.2d 992, 1008–10 (3d Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 2442, 104 L.Ed.2d 998 (1989); *United States v. White,* 869 F.2d 822, 825 (5th Cir.) (per curiam), *cert. denied,* —— U.S. ——, 109 S.Ct. 3172, 104 L.Ed.2d 1033 (1989).

4. This issue is currently pending before the Supreme Court of the United States. *United States v. Munoz–Flores,* 863 F.2d 654 (9th Cir.1988), *cert. granted,* —— U.S. ——, 110 S.Ct. 48, 107 L.Ed.2d 17 (1989). Under other circumstances, the most prudent and respectful course might be to hold this case in abeyance until the Supreme Court's ruling. However, this case involves other issues. Therefore, we believe that our duty to adjudicate expeditiously criminal appeals requires that we decide this appeal in due course.

provided for in 18 U.S.C. § 3013(a)(2)(A),[5] Mr. Tholl, like any individual convicted of a federal felony, was fined $50. Mr. Tholl contends that the special assessment statute is invalid as a violation of the origination clause of the United States Constitution, article I, section 7. The origination clause states that "[a]ll Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills." Mr. Tholl's argument is that the special assessment is a revenue bill that originated in the Senate rather than the House. To support his claim, Mr. Tholl relies exclusively on the reasoning of *United States v. Munoz–Flores*, 863 F.2d 654 (9th Cir.1988), *cert. granted,* —— U.S. ——, 110 S.Ct. 48, 107 L.Ed.2d 17 (1989), in which the Ninth Circuit expressly held that the special assessment violated the origination clause.[6] *Id.* at 661. As the Ninth Circuit suggested, the language of the origination clause provides the framework under which we ought to analyze an origination clause question. First, we must determine if the measure was a "bill for raising revenue" within the meaning of the clause; second, if the bill was indeed a revenue-raising bill, we must determine whether it originated in the Senate; and third, even if the bill was a revenue bill that originated in the Senate, we must inquire whether the measure was a permissible germane amendment to a House revenue bill. *See Munoz–Flores,* 863 F.2d at 657–61.[7] We need only reach the first

5. 18 U.S.C. § 3013(a)(2) provides as follows:
   (a) The court shall assess on any person convicted of an offense against the United States—
   . . . .
   (2) in the case of a felony—
   (A) the amount of $50 if the defendant is an individual; and
   (B) the amount of $200 if the defendant is a person other than an individual.

6. Although the bases for disagreement have not been uniform, *Munoz–Flores* has not been followed by many courts. *See, e.g., United States v. King,* 891 F.2d 780, 782–84 (10th Cir.1989) (§ 3013 is not a revenue-raising measure because primary purposes are victim assistance and punishment of offenders); *United States v. Newman,* 889 F.2d 88, 97–100 (6th Cir.1989) (§ 3013 is not a revenue-raising measure because main purpose is victim assistance); *United States v. Herrada,* 887 F.2d 524, 527–28 (5th Cir.1989) (§ 3013 is not a revenue-raising measure because main purpose is victim assistance); *United States v. Simpson,* 885 F.2d 36, 40–41 (3d Cir.1989) (§ 3013 is not a revenue-raising measure because its purpose is victim assistance); *United States v. Ashburn,* 884 F.2d 901, 903 (6th Cir.1989) (§ 3013 is not a revenue measure because its goals are to penalize offenders and assist victims); *United States v. Griffin,* 884 F.2d 655, 656 (2d Cir.1989) (§ 3013 is not a revenue-raising measure because its purpose is penal); *United States v. Vines,* 718 F.Supp. 895, 898–900 (S.D.Ala.1989) (any revenue raised by § 3013 is incidental to primary purposes of penalization and victim assistance); *United States v. Yearwood,* 718 F.Supp. 14, 15 (E.D.La.1989) (adopts conclusion of other district courts that § 3013 is constitutional) *aff'd,* 894 F.2d 404 (5th Cir.1990); *United States v. Conner,* 715 F.Supp. 1327, 1331–32 (W.D.N.C.1989) (§ 3013 is not revenue-raising because primary purpose is victim assistance); *United States v. Valentine,* 715 F.Supp.

51, 53 (W.D.N.Y.1989) (revenue-raising feature of § 3013 is merely incidental to primary purpose of victim assistance); *United States v. Madison,* 712 F.Supp. 1379, 1383–86 (W.D.Wis. 1989) (expressing belief that origination clause issue was a nonjusticiable political question, but going through with analysis and concluding § 3013 was not a revenue-raising measure); *United States v. Clark,* 711 F.Supp. 736, 739–40 (S.D.N.Y.1989) (§ 3013 was a revenue-raising measure, but permissibly originated in the House); *United States v. Greene,* 709 F.Supp. 636, 639 (E.D.Pa.1989) (primary purpose of § 3013 is to assist crime victims); *United States v. McDonough,* 706 F.Supp. 692, 694 (D.Minn. 1989) (§ 3013 is not revenue-raising because purpose is victim assistance).

7. We also note that our colleagues in the Fifth Circuit have held that the determination of whether a particular legislative measure is a "bill[ ] for raising revenue" is a nonjusticiable political question. *See Texas Ass'n of Concerned Taxpayers, Inc. v. United States,* 772 F.2d 163, 165–67 (5th Cir.1985), *cert. denied,* 476 U.S. 1151, 106 S.Ct. 2265, 90 L.Ed.2d 710 (1986). In the past, the Supreme Court explicitly has reserved the issue. *Rainey v. United States,* 232 U.S. 310, 317, 34 S.Ct. 429, 431, 58 L.Ed. 617 (1914); *Flint v. Stone Tracy Co.,* 220 U.S. 107, 143, 31 S.Ct. 342, 346, 55 L.Ed. 389 (1911); *Twin City Bank v. Nebeker,* 167 U.S. 196, 202, 17 S.Ct. 766, 768, 42 L.Ed. 134 (1897). Because this issue is currently pending before the Supreme Court, *United States v. Munoz–Flores,* 863 F.2d 654 (9th Cir.1988), *cert. granted,* —— U.S. ——, 110 S.Ct. 48, 107 L.Ed.2d 17 (1989) (granting certiorari and requesting that the parties brief the political question doctrine in addressing the justiciability issues in the case), we believe that a respectful silence on this issue is the most appropriate course; an alternate avenue of deci-

prong of the analysis because we conclude that the special assessment provision of 18 U.S.C. § 3013 is not a revenue-raising bill within the meaning of the origination clause.

### 1.

As a starting point, we believe that it is important to recall that the Supreme Court consistently has followed Justice Story's narrow definition of "bills to raise revenue." "According to that construction, it 'has been confined to bills to levy taxes in the strict sense of the words, and has not been understood to extend to bills for other purposes which incidentally create revenue.'" *United States v. Norton*, 91 U.S. (1 Otto) 566, 569, 23 L.Ed. 454 (1875) (quoting 1 Story on the Constitution § 880). *Accord, Millard v. Roberts*, 202 U.S. 429, 436, 26 S.Ct. 674, 675, 50 L.Ed. 1090 (1906); *Twin City Bank v. Nebeker*, 167 U.S. 196, 202–03, 17 S.Ct. 766, 768–69, 42 L.Ed. 134 (1897). Consequently, the Supreme Court found no violation of the origination clause when Congress enacted a statute providing that funds received from the sale of money orders were to be deemed money in the Treasury of the United States. *Norton*, 91 U.S. (1 Otto) at 568. Similarly, a tax on the average notes in circulation of a banking association in order to provide "a national currency secured by a pledge of bonds of the United States ... and ... to meet the expenses attending the execution of the act," *Nebeker*, 167 U.S. at 202, 17 S.Ct. at 769, is not within the ambit of the constitutional provision. Nor is a law levying a tax on property within the District of Columbia in order to raise money for certain railroad construction activity. *Millard*, 202 U.S. at 436–37, 26 S.Ct. at 675.

### 2.

We now examine the statutory language to determine whether, in light of the purpose of the special assessment, the constitutional stricture applies. The special assessment was enacted as part of the Victims of Crime Act of 1984, Pub.L. No. 98–473, 98 Stat. 2170 (the Act).[8] Although the Act contains no express statement of purpose, it creates a separate Treasury account called the "Crime Victims Fund" (the Fund) into which various criminal "fines," including the special assessment, are deposited. 42 U.S.C. § 10601(a), (b). The Attorney General is required to make annual grants from the Fund to eligible crime victim compensation and assistance programs. 42 U.S.C. §§ 10602–03.[9] Thus, although neither the Act nor the special assessment contains language denominated "statement of purpose," an examination of the language reveals that the purpose of the special assessment is to endow the Fund, and the purpose of the Fund is to compensate and assist victims of crime.

Moreover, this conclusion is buttressed by an examination of the legislative history. The Senate Judiciary Committee Report stated that the purposes of the Act were as follows:

(1) To establish a special fund in the United States Treasury to finance payments to State and Federal victims compensation and assistance programs;

(2) To encourage States to provide assistance to victims of crime within their borders regardless of the victim's residence or the jurisdiction of the crime;

(3) To assist local government and private nonprofit organizations in providing direct services to victims of crime and to promote national development of comprehensive victims services;

(4) To create a safe and welcome environment for victims who will be involved in the criminal justice process; and

(5) To improve Federal assistance to the victims of Federal crime.

---

sion grounded in the precedent of the Supreme Court is available to us. *Cf. Nebeker*, 167 U.S. at 203, 17 S.Ct. at 763 (declining to address the justiciability issue because the statute can be construed as a non-revenue measure).

**8.** *See generally* Office of Justice Programs, U.S. Department of Justice, Indexed Legislative His-

tory of the Victims of Crime Act of 1984 (1985) [hereinafter Indexed Legislative History].

**9.** The requirement to make these grants is, of course, subject to the availability of monies in the Fund. 42 U.S.C. §§ 10602(a)(2), 10603(a)(1).

S.Rep. No. 497, 98th Cong., 2d Sess. 4–5 [hereinafter Senate Report], *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3607, 3610–11.[10] We do not believe that this clear statement of purpose was undermined by Congress' initial imposition of a $100 million ceiling on the Fund and provision that all sums deposited in excess of that ceiling would be shifted to the general Treasury Fund. *See* Victims of Crime Act of 1984, Pub.L. No. 98–473, § 1402(c)(1), 98 Stat. 2170, 2171.[11] Although the *Munoz–Flores* court did not specifically mention the $100 million ceiling on the Fund as a basis for invalidating the special assessment provision, such an argument follows from its conclusion that the measure was not "clearly confined" to the purpose of victim assistance. *See Munoz–Flores*, 863 F.2d at 658–59; *supra* note 10. We find this "not clearly confined" rationale unper-

suasive. "[B]ills for other purposes which may incidentally create revenue" do not run afoul of the origination clause. *Twin City Bank v. Nebecker*, 167 U.S. 196, 202–03, 17 S.Ct. 766, 769, 42 L.Ed. 134 (1897) (citing 1 Story on Constitution § 880).[12] Indeed, in *United States v. Norton*, the challenged statute defined all funds received by the Postmaster from the sale of money orders "'to be deemed and taken to be money in the treasury of the United States.'" 91 U.S. (1 Otto) at 568, 23 L.Ed. 454 (1875). Nonetheless, the Supreme Court held that the measure was not a "revenue law" within the meaning of the origination clause. *Id.* at 568–69. Similarly, we conclude that the special assessment provision of 18 U.S.C. § 3013 is not a "bill for raising revenue" within the meaning of the origination clause.[13]

**10.** The *Munoz–Flores* court concluded, based on language in this same report, that the special assessment was a general revenue-raising bill. 863 F.2d at 658–59. We respectfully disagree with this conclusion. The *Munoz–Flores* court focused on the following statement from the Senate Report:

> The purpose of imposing nominal assessment fees is *to generate needed income to offset the cost of the [victim's assistance fund]* authorized under S. 2423. Although substantial amounts will not result, these additional amounts will be helpful in financing the program *and will constitute new income for the Federal government.*

*Id.* at 658 (quoting Senate Report at 13–14, *reprinted in* 1984 U.S.Code Cong. & Admin. News at 3619–20) (emphasis and brackets supplied by the *Munoz–Flores* court). On the basis of this statement, the *Munoz–Flores* court concluded that the proceeds of the special assessment provision were not "clearly confined" to the purpose of victim assistance. *Id.* at 658–59. We note, however, that the lack of an express provision permanently immunizing funds from use as general revenue did not prevent the Supreme Court from upholding other legislation against origination clause challenges. *See Millard v. Roberts*, 202 U.S. 429, 436–37, 26 S.Ct. 674, 675, 50 L.Ed. 1090 (1906); *Twin City Bank v. Nebecker*, 167 U.S. 196, 202–03, 17 S.Ct. 766, 769, 42 L.Ed. 134 (1897); *United States v. Norton*, 91 U.S. (1 Otto) 566, 569, 23 L.Ed. 454 (1875). Moreover, we believe that the statement above cannot be read in isolation from the rest of the Senate Report, including the unambiguously stated purposes of the Act, as quoted in the text above. Thus, we find unpersuasive the *Munoz–Flores* court's reasoning on this point.

**11.** The ceiling has since been raised. In 1986 the ceiling was raised to $110 million, Chil-

dren's Justice and Assistance Act of 1986, Pub.L. No. 99–401, Title I, § 102(b)(1), 100 Stat. 903, 904, and in 1988, two new ceilings were imposed: $125 million through fiscal year 1991 and $150 million through fiscal year 1994. 42 U.S.C. § 10601(c)(1)(B) (Supp.1989).

**12.** *See United States v. Simpson*, 885 F.2d 36, 43 (3d Cir.1989) (examining the "sparse" legislative history regarding the $100 million ceiling and finding no evidence that Congress intended the ceiling to be exceeded).

**13.** Because we have decided the origination clause issue on the first prong of the test, we need not reach the difficult question whether the bill originated in the House or the Senate. We note, however, that an examination of the legislative history reveals that the bill indeed may have originated in the House. Although the special assessment language of § 3013 was added by a Senate amendment to a joint resolution (H.J. Res. 648) that eventually enacted the text of 18 U.S.C. § 3013, the issue is whether the Senate borrowed the special assessment language from a pre-existing House bill or Senate bill. *See* Thurmond Amendment No. 7043 to H.J. Res. 648, 98th Cong., 2d Sess., 130 Cong. Rec. S13,520, S13,544 (daily ed. Oct. 4, 1984). There are at least two House bills and one Senate bill from which the language conceivably could have come. *See* H.R. 5690, § 1005, 98th Cong., 2d Sess., 130 Cong. Rec. H10,682, H10,721 (daily ed. Oct. 2, 1984); H.R. 3498, 98th Cong., 1st Sess., *reprinted in* Indexed Legislative History, *supra* note 8, at 176; S. 2423, 98th Cong., 2d Sess., 130 Cong.Rec. 23,803, 23,805 (1984). S. 2423 was introduced and passed earlier than H.R. 5690; H.R. 3498 was introduced before S. 2423, but apparently never was passed

## C. Sentence Enhancement for "Physical Restraint" of the Victim

■ Mr. Tholl next contends that the district court misapplied guideline section 3A1.3, which, with certain exceptions, authorizes an increase of two offense levels if the victim was "physically restrained in the course of the offense." Sentencing Guideline § 3A1.3.[14] The district court concluded that Mr. Tholl's restraint of Mr. Dale Prout during the course of the bogus drug "arrest" warranted the two-level increase under section 3A1.3. The essence of Mr. Tholl's complaint is that his case falls within one of the exceptions to section 3A1.3. The "physical restraint" adjustment is not to be applied if one of three exceptions is met. These exceptions are set forth in Application Note 2 to section 3A1.3. See supra note 14. Application Note 2 states that the "physical restraint" adjustment applies to all offenses in which the victim was physically restrained, except in the following situations: (1) where physical restraint "is an element of the offense"; (2) where physical restraint is "specifically incorporated into the base offense level"; or (3) where physical restraint is "listed as a specific offense characteristic." Mr. Tholl claims that his case fits within exception (3).

The specific offense characteristic for Impersonation, Mr. Tholl's underlying offense, does not specifically list "physical restraint." See § 2J1.4(b)(1).[15] Nevertheless, Mr. Tholl claims that the concept of "physical restraint" is included within that specific offense characteristic because (1) the specific offense characteristic of Impersonation, section 2J1.4(b)(1), authorizes a six-level increase if the defendant "falsely represented himself ... to conduct an un-

by the House; and H.R. 5690, although introduced and passed later than S. 2423, contains language identical to § 3013 (whereas S. 2434 contains similar, although not identical language), and was passed two days before Senator Thurmond's amendment that added the special assessment language to H.J. Res. 648. Moreover, the legislative history suggests that H.R. 5690 actually was an attempt to reconcile three bills: H.R. 3498, S. 2423, and an administration bill. See 130 Cong.Rec. H12,083, H12,084 (daily ed. Oct. 10, 1984) (remarks of Congressman Rodino).

The government, relying on the fact that the language of H.R. 5690, § 1005, is identical to the language of 18 U.S.C. § 3013 as enacted, argues that the best test for "origination" is to see which house first passed the exact language that ultimately was enacted into law. Appellee's Br. at 14. As a fallback position, the government argues that H.R. 3498, which was introduced before S. 2423, is more similar to the enacted provision than is S. 2423. Appellee's Br. at 14, 14 n. 8, 15; compare S. 2423, Title II, § 101, 98th Cong., 2d Sess., 130 Cong.Rec. 23,-805 (1984) with H.R. 3498, Title IV, § 402(a), reprinted in Indexed Legislative History, supra note 8, at 176. The government also notes that the Munoz–Flores court did not address the existence of the prior House bills in its analysis of where the special assessment provision originated. Appellee's Br. at 12–15. We note that several recent cases have concluded that the bill originated in the House. See United States v. Madison, 712 F.Supp. 1379, 1381–82, 1384–85 (W.D.Wis.1989) (deciding the issue on grounds that § 3013 was not a revenue-raising measure, but examining the legislative history and concluding that the bill "appears to have originated in the House"); United States v. Clark, 711 F.Supp. 736, 739–40 (S.D.N.Y.1989) (although § 3013 is a revenue-raising measure, it permissibly originated in the House).

14. Section 3A1.3 reads as follows:

§ 3A1.3. Restraint of Victim
If the victim of a crime was physically restrained in the course of the offense, increase by 2 levels.

Commentary
Application Notes:
1. "Physically restrained" is defined in the Commentary to § 1B1.1 (Application Instructions).
2. This adjustment applies to any offense in which the victim was physically restrained in the course of the offense, except where such restraint is an element of the offense, specifically incorporated into the base offense level, or listed as a specific offense characteristic.

15. Section 2J1.4 reads as follows:

§ 2J1.4. Impersonation
(a) Base Offense Level: 6
(b) Specific Offense Characteristic
(1) If the defendant falsely represented himself as a federal officer, agent or employee to demand or obtain any money, paper, document, or other thing of value or to conduct an unlawful arrest or search, increase by 6 levels.

Commentary
Statutory Provisions: 18 U.S.C. §§ 912, 913.
Background: This section applies to impersonation of a federal officer, agent, or employee; and impersonation to conduct an unlawful search or arrest.

lawful *arrest* or search" (emphasis supplied); (2) the act of "physical restraint" is inherent in an arrest; (3) therefore, the act of physical restraint is encompassed within the specific offense characteristic of section 2J1.4(b)(1). Consequently, Mr. Tholl submits that the district court double-counted his "unlawful arrest" of Mr. Prout by using it both to satisfy the specific offense characteristic of Impersonation under section 2J1.4 in order to increase his offense level by six and to find "physical restraint" of the victim within the meaning of section 3A1.3 to enhance his offense level by two. Appellee's Br. at 14. We now turn to an evaluation of that argument.

When the guidelines are viewed in their totality, it becomes clear that the "physical restraint" enhancement contained in section 3A1.3 had a very obvious purpose: the drafters of the guidelines intended that any offender who physically restrains his victim should receive a two-level offense increase over offenders who commit the same offense but do not restrain their victims. Those guidelines that do treat physical restraint as a specific offense characteristic mandate a two-level increase if physical restraint was used.[16] Therefore, section 3A1.3 merely supplements the guidelines by mandating the same two-level increase for any offense where physical restraint was employed by the defendant, but was not listed as a specific characteristic of that offense. The exceptions to section 3A1.3 merely prevent double-counting of physical restraint under section 3A1.3 when a two-level increase for physical restraint already has been taken into account under the base offense or the specific offense characteristic, or when the act of physical restraint is an element of the underlying offense. *See supra* note 14 (quoting § 3A1.3, Application Note 2).

When this underlying policy is understood and considered in light of the specific offense characteristic of Impersonation as worded in section 2J1.4(b)(1), it becomes clear that the customary two-level "physi-

cal restraint" enhancement was not taken into account in that section. First, while the drafters of the guidelines were careful to list expressly physical restraint as an offense characteristic of some offenses, *see supra* note 16, it is not expressly listed as a specific offense characteristic of Impersonation in section 2J1.4(b)(1). This failure to include a specifically defined term within the specific offense characteristic of Impersonation in section 2J1.4, while listing it in other specific offense characteristics, suggests that the omission was intentional. Moreover, while the specific offense characteristic for Impersonation does list "arrest," that term is not the functional equivalent of the sort of "physical restraint" as defined in section 1B1.1, Application Note 1(i) (defining "[p]hysically restrained" as "the forcible restraint of the victim such as being tied, bound, or locked up").

We agree with the district court that an arrest, as that term is used in section 2J1.4(b)(1), does not necessarily entail the sort of forcible physical restraint contemplated by section 1B1.1, Application Note 1(i). Furthermore, we note that the district court specifically found that the victim was restrained forcibly when he was required by the defendants to drive around with them in search of other targets. Accordingly, we cannot accept Mr. Tholl's argument. It is contrary to both the letter and the spirit of the guidelines.

### D. Challenge to the "Minor Participant" Determination

■ Mr. Tholl next argues that the district court improperly denied him a two-level decrease by refusing to find him a "minor participant" within section 3B1.2(b). "Minor participant" is defined in Application Note 3 as "any participant who is less culpable than most other participants, but whose role could not be described as minimal." § 3B1.2, Application Note 3. Mr. Tholl argues that he qualified as a "minor participant" because only two participants, he and his brother, were involved in the

16. *See* §§ 2B3.1(b)(4)(B) (*Robbery*); 2B3.2(b)(4)(B) (*Extortion by Force or Threat of Injury or Serious Damage*); 2E2.1(b)(3)(B) (*Making,* *Financing, or Collecting an Extortionate Extension of Credit*).

DEA impersonation scheme, and because the district court had found that Mr. Tholl's brother was the real "mastermind" behind the scheme. Mr. Tholl's apparent contention is that the district court, by noting that his brother "provided the energy and drive to get the caper moving," should have been compelled to conclude that Mr. Tholl was less culpable than his brother. Mr. Tholl also challenges the court's articulated basis for denying him "minor participant" status. He argues that the court's reliance on the facts it cited in the record utilized a definition of "minor participant" other than the simple "less culpable" definition provided in the Application Note to section 3B1.2. *See* Tr. 26 at 84–86.

The standard for reviewing district court findings and determinations under section 3B1.2 is clear error. *See United States v. Miller,* 891 F.2d 1265, 1270–71 (7th Cir. 1989). The district court's conclusion that Mr. Tholl was not a "minor participant" certainly was not clear error. Edward Tholl did participate significantly in the false drug arrests, even though he neither thought up the scheme nor played the most active role in procuring the bogus DEA credentials. His participation in the scheme indicated a culpable desire to profit from the scheme. The essence of Mr. Tholl's argument is that he should be rewarded by a two-level reduction simply because he did not concoct the scheme or take the lead in procuring the bogus credentials. The district court properly rejected this argument.

### CONCLUSION

For the foregoing reasons, the decision of the district court is affirmed.

AFFIRMED.